James M. PARKS, Appellant,

v.

The STATE of Texas, Appellee.

No. 213–82.

Court of Criminal Appeals of Texas,
En Banc.

Dec. 9, 1987.

Michael P. Gibson, Bob Gorsky, Dallas, for appellant.

Henry Wade, Dist. Atty. and T. Michael Sutton, Jon Sparling and Jim Johnson, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

OPINION ON APPELLANT'S PETITION
FOR DISCRETIONARY REVIEW

McCORMICK, Judge.

In February of 1978, appellant was convicted of the offense of forgery[1] after a trial by jury. The jury assessed appellant's punishment at four years' confinement and a $5000 fine.

We granted appellant's petition for discretionary review to consider the admissibility into evidence of extraneous offenses. The prosecution, in its case in chief, introduced over defense counsel's timely objection evidence of two extraneous offenses of the same nature as the one for which the defendant was on trial. The State maintains that these two offenses, which were allegedly committed by the defendant and for which he was not indicted, were admissible to prove intent.

Appellant on the other hand contends that there was other evidence which was sufficient to show the appellant's intent to defraud. Appellant thus reasons that intent was not in issue in this case and that any evidence of extraneous offenses would be extremely prejudicial and have little or no probative value. In regard to this issue, appellant further contends that the Court of Appeals failed, in determining the admissibility of this evidence, to apply the balancing test established by this Court in *Albrecht v. State*, 486 S.W.2d 97, 99 (Tex. Cr.App.1972). See also, *Hernandez v. State*, 484 S.W.2d 754, 755 (Tex.Cr.App. 1972). This test requires that a determination be made as to whether the prejudicial effects of admitting this evidence are outweighed by the probative value this evidence may have in aiding the trier of fact in reaching a verdict. *Albrecht v. State*, supra. See also *Boutwell v. State*, 719 S.W.2d 164 (Tex.Cr.App.1985); *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Cr.App. 1984). This "test" is really nothing more

1. Article 1008 (Penal Code, 1925)

than a statement of a fundamental principle of evidence. The "test" has been further developed in the *Williams* case. For the sake of convenience it will be referred to in this opinion as the *"Williams"* test.

Because of the nature of the appellant's claim, it is necessary to review the evidence presented at trial. The appellant is accused of having executed a deed of trust to an individual in the amount of $55,000 on certain property located in Dallas County. After the time of the deed of trust's execution, a forged release of lien on the property in question was recorded in the Dallas County deed records. Appellant then executed a new deed of trust to Oak Cliff Savings and Loan on the same property in the amount of $60,000. Appellant was subsequently indicted for the offense of forgery. The State alleged he had forged the names appearing on the fraudulent release of lien. The lien in question was dated March 21, 1972. The names allegedly forged on the release of lien were Hubert Owens, Jean Schrang Williams, and Linda Smith, whose name appeared notarizing the release. This release of lien was introduced by the State as Exhibit 11.

The State also introduced into evidence, over appellant's objection, State's Exhibit 21, a release of lien on another piece of property. This release was dated June 1, 1972. The State also introduced another release of lien on a third piece of property dated September 6, 1972, as State's Exhibit 31. Evidence was then introduced to show that as a result of the execution and filing of all three releases of lien appellant was able to execute new deeds of trust on the three tracts of land and thus make a substantial sum of money. The evidence showed appellant was able to realize $57,867 from the lien known as State's Exhibit 11, $70,370 from the lien under State's Exhibit 21, and $148,723.33 from State's Exhibit 31.

The State then presented evidence from each of the individuals whose names were signed to State's Exhibit 11. These witnesses testified that they did not sign the instrument, that they did not know who had signed their names to the instrument, and that they had not given anyone permission to sign their names.

Finally, the State was able to present expert testimony from a document examiner who testified that he could positively state that the appellant had signed another person's (Linda Smith) name to the release of lien introduced as State's Exhibit 11. He was also able to say that the appellant had signed two of the three names on the document marked State's Exhibit 21, and two of the three names on State's Exhibit 31. Evidence also showed that all three documents were filed and recorded in the Dallas County Clerk's office. The court's charge to the jury instructed them to consider the two extraneous offense for the limited purposes of determining the appellant's intent to defraud and/or his knowledge that the release of lien was a forged document.

The policy behind limiting the admissibility into evidence of extraneous offenses is well established. In our system of justice an accused person may not be tried for collateral criminal offenses or for being a criminal generally. *Williams v. State,* supra; *Albrecht v. State,* supra; *Rubio v. State,* 607 S.W.2d 498, 499 (Tex.Cr.App. 1980). As this Court has often noted, evidence of extraneous offenses is of an inherently prejudicial nature and may tend to confuse the issues of the case. *Albrecht v. State,* supra. Such evidence carries with it the additional danger that an accused person may be called upon to defend himself against an implied charge of having a propensity to commit crimes rather than the specific offense for which he is on trial. *Williams v. State,* supra; *Elkins v. State,* 647 S.W.2d 663, 665 (Tex.Cr.App.1983); *Bates v. State,* 643 S.W.2d 939, 944 (Tex. Cr.App.1982); *Albrecht v. State,* supra.

This sound general principle of evidence has, however, several exceptions. This is because circumstances exist in a variety of fact situations which either mitigate the danger of such evidence or which justify the admission of such evidence in spite of the danger that this evidence will create unfair prejudice. *Boutwell v. State,* supra; *Albrecht v. State,* supra.

In *Albrecht,* this Court listed several common exceptions to the general rule of prohibiting the admission of extraneous offenses. In *Albrecht,* we stated:

"Evidence of extraneous offenses committed by the accused has been held admissible: (1) To show the context in which the criminal act occurred—what has been termed the 'res gestae'—under the reasoning that events do not occur in a vacuum and that the jury has a right to hear what occurred immediately prior to and subsequent to the commission of that act so that they may realistically evaluate the evidence. (2) To circumstantially prove identity where the state lacks direct evidence on this issue. (3) To prove scienter, where intent or guilty knowledge is an essential element of the state's case and cannot be inferred from the act itself. (4) To prove malice or state of mind, when malice is an essential element of the state's case and cannot be inferred from the criminal act. (5) To show the accused's motive, particularly where the commission of the offense at bar is either conditioned upon the commission of the extraneous offense or is a part of a continuing plan or scheme of which the crime on trial is also a part. (6) To refute a defense theory raised by the accused." (footnotes omitted). 486 S.W.2d at 100–101.

Although the list of exceptions appearing in *Albrecht* is an accurate and well written statement as to the current law of evidence, it has created much confusion. As we noted in *Williams v. State,* supra, this statement in *Albrecht* was not meant to be an exhaustive and exclusive list of exceptions to the general rule making evidence of extraneous offenses inadmissible. The statement in *Albrecht* is also not a rule, standard or test to determine the admissibility of evidence of extraneous offenses. *Williams v. State,* supra. Rather, the circumstances which justify the admissions of extraneous offenses are as varied as the factual circumstances of each case wherein the question arises. *Albrecht v. State,* supra.

It has become well established that such evidence is clearly admissible when the prosecution can show both that the offense or transaction is relevant to a material issue in the case, and the probative value of the evidence to the trier of fact is not outweighed by its prejudicial or inflammatory nature. *Boutwell v. State,* supra; *Plante v. State,* 692 S.W.2d 487, 491 (Tex. Cr.App.1985); *Williams v. State,* supra, at 346; *Elkins v. State,* supra, at 665; *Murphy v. State,* 587 S.W.2d 718, 722 (Tex.Cr. App.1979). *Rubio v. State,* supra, (concurring opinion).

We must determine first if the evidence of extraneous offenses is relevant to a material issue in dispute in the case, and second, if the probative value of such evidence outweighs its prejudicial effect. The *Williams* test is, therefore, a two prong one. In applying this test to the facts of this case, we find that the probative value of the evidence in question far outweighs its prejudicial effect.

In cases of forgery and fraud, it is difficult to prove intent. *Robledo v. State,* 480 S.W.2d 401, 402 (Tex.Cr.App.1972); *Harris v. State,* 169 Tex.Cr.R. 143, 333 S.W.2d 142, 144 (1960); *Verner v. State,* 117 Tex.Cr.R. 112, 35 S.W.2d 428, 429 (1931). This Court has wisely held that intent or guilty knowledge cannot be inferred from the mere passing of a forged instrument. *Albrecht v. State.* Indeed, to hold otherwise would create the danger that the unknowing and accidental passing of a forged instrument could effectively become a strict liability offense. The issue of intent is of such overriding importance in a case of forgery that it effectively becomes the focus of the State's case. Establishing intent in such cases is so crucial and so difficult to do that, as a practical matter, evidence of extraneous offenses is nearly always admissible. *Robledo v. State,* supra; *Harris v. State,* supra; *Vernon v. State,* supra. While it is hypothetically possible that a case of forgery could be established by direct evidence, such as eyewitness testimony, most cases of forgery rest on circumstantial evidence. In the vast majority of such cases, the probative value of evidence of extraneous offenses will inevitably outweigh its prejudicial effect.

In applying the first prong of the *Williams* test to the case before us, we find the extraneous offenses alleged were relevant to a material element of the State's case. The transactions involved were very nearly identical to the offense for which the appellant was charged. Taken together, they showed that it was more likely than not that the appellant had formed an intent to commit the offense pursuant to a general plan to enrich himself. Therefore, the extraneous offenses were relevant to a material element of the State's case, that is, that the appellant had the requisite mental culpability necessary to establish that a crime had been committed. The first prong of the *Williams* test is thus satisfied.

The second prong of the *Williams* test involves the balance between the probative and the prejudicial aspects of the evidence in question. In assessing this balance between the probative value of the evidence versus its prejudicial effect, it is necessary to view the nature of the State's case. The State's case rested entirely on circumstantial evidence. The State's case consisted of evidence that appellant had passed the forged documents, and expert opinion testimony from a documents examiner. He stated that in his opinion the appellant was the person who forged Linda Smith's signature on the document marked State's Exhibit 11.

As we noted above, intent cannot be inferred from the mere passing of a forged document. *Albrecht,* supra. Therefore, without evidence of extraneous offenses, the strongest evidence of the defendant's guilt was the opinion testimony of the State's expert. Expert opinion testimony is just that, opinion testimony. The value of opinion testimony hinges on the personal credibility of the witness who offers it and upon the credibility of his qualifications. The trier of fact must determine whether the expert witness' testimony is accurate or believable, and the jury may choose to disregard the testimony altogether. See *McDaniel v. United States,* 343 F.2d 785 (5th Cir.1965). Furthermore, the testimony of expert witnesses is subject to cross-examination and impeachment. In this case,

appellant's attorney was able to elicit from the State's witness the fact that he had no formal training in handwriting analysis, that he was paid by the State and that he had testified in fifty cases, each time as a witness for the State.

Standing alone, the expert opinion testimony in this case was not strong evidence that the appellant had even committed the *actus reas* necessary to establish the commission of a crime. It was even less evidence to show the necessary culpable mental state, that is, that the appellant committed this offense with the intent to defraud or with the knowledge that his acts would likely result in a fraudulent transaction harmful to someone's interest.

The probative value of the extraneous offenses was very great, and in point of fact, very nearly essential to proving the State's case in chief. Whatever prejudice attended the admission of such evidence was far outweighed by its probative value to the trier of fact. This is particularly true in view of the fact that the two extraneous offenses were nearly identical to the one for which the appellant was tried. This evidence made it far more likely that appellant had committed the offense in question. The similarity of the offenses further reduced the inflammatory impact of this evidence.

The second prong of the *Williams* test is also satisfied. After applying the principles of evidence established in *Albrecht* and *Williams,* it is clear that the evidence was properly admitted.

We, therefore, overrule appellant's contention and affirm the judgment of the Court of Appeals.

TEAGUE, J., dissents.

CLINTON, Judge, dissenting.

What happened in this case may be stated quite simply. Prosecution persuaded trial judge to admit evidence of two unadjudicated fraudulent transactions on issues of intent and knowledge which the prosecutor appropriated not so much to argue they showed intent and knowledge, but more to

urge the jury to deny appellant probation because the aggregated amounts of money obtained through all three transactions is "a quarter of a million dollars."

The prosecution did not really need extraneous offense to help prove intent and knowledge, as shall be demonstrated *post.* First, however, there are several observations that must be made about the majority opinion.

On page 740 the majority says that it is "well established that such evidence [of extraneous offense] is *clearly admissible* when the prosecution can show ... the probative value of the evidence to the trier of fact is not *outweighed by its prejudicial or inflammatory nature."* (My emphasis here and throughout unless otherwise noted.) See, however, Tex.R.Cr.Evid. Rule 403 for a more accurate statement of the rule.

And beyond that, just when we are moving the Court away from such a notion, the majority opinion reverts to *Albrecht's* quaint "exceptions to the general rule." At 739. Furthermore, what it calls "*Williams* test" is garbled at page 740. Whatever evidence is "relevant to a material issue *in dispute* in the case" was said in *Williams,* by quoting *Elkins* which in turn was quoting from my concurring opinion in *Rubio,* to be applicable only "in a case established by *direct* evidence." Before us now is a circumstantial evidence case, and as *Williams* itself makes clear:

"In a circumstantial evidence case, admissibility as part of the State's direct evidence depends on the transaction's relevance to a material issue which the State must prove."

Accord: *Morgan v. State,* 692 S.W.2d 877, 880–881 (Tex.Cr.App.1985). In *Morgan* a unanimous Court also questioned validity of that dichotomy, *viz:*

"There is likewise no conceptual necessity to differentiate between circumstantial and direct evidence in determining the admissibility of extraneous acts of misconduct."

*Id.,* at 879–880, n. 2; also see n. 3. Moreover, Tex.Cr.R.Evid. Rules 401 and 404(b) make no such distinction.

The majority opinion dwells on how difficult it is to prove intent in forgery, yet proving it is "so crucial" that "as a practical matter, evidence of extraneous offense is nearly always admissible." *Ergo,* in most cases "probative value of evidence of extraneous offense will inevitably outweigh its prejudicial effect." At 740–741. However, such sweeping generalizations are not helpful in a cause under our old penal code.

Former article 1008 is a special forgery statute dealing a particular class of instruments, i.e. any character of instrument affecting title to land, including expressly any "release" and any "acknowledgment" to any such instrument. Coupled with article 1006, there are precise specific intents, one of which is "intent to make money," and a catchall, *viz:* "any fraudulent intent whatever." It was enacted when making forged instruments of title was so widespread that to deter that practice the Legislature broadly stated means and manner of committing an offense and affixed a higher penalty than for ordinary forgery. A charge to jury must submit under those articles, not general forgery statutes. *Dillard v. State,* 77 Tex.Cr.R. 1, 177 S.W. 99 (1915) (Opinion on Rehearing, 177 S.W. at 107). Article 1010 dictates that minimal proof will suffice, *viz:*

"[T]o warrant a conviction, it shall only be necessary to prove that the person charged took any one step, or did any one act or thing in the commission of the offense, if from such step, act or thing any of the intentions hereinbefore mentioned, or any other fraudulent intention may be inferred...."

Indictment in this cause is drawn from article 1008, and charge to jury tracks indictment.[1] The jury found appellant guilty of "knowingly *uttering* a false instrument

---

1. In pertinent part, both state that "with *intent to defraud"* appellant did "fraudulently *utter,* publish and use, as true and genuine, a certain false and forged release ... [which] related to

and affected the title to land ... [and] *knew* that the foregoing release ... was false and forged."

The jury was also instructed that "*utter,* publish and use, as true and genuine include ...

as alleged in the indictment." Thus at page 2 the majority opinion wrongly says, "The State alleged *he had forged* the names appearing on the fraudulent release of lien." However, proof that he had forged one or more of them, especially the acknowledgement, would show his knowledge that the release was false and forged.

In this connection, the State is laboring under an impression that it has to prove appellant knew signature of Hubert Owens was forged as alleged in the indictment. State's Brief, p. 3. The majority opinion does not address this concern, but focuses instead on his intent to defraud, emphasizing through repetition that such intent cannot be inferred "from the mere passing of a forged instrument." Factually, there is much more in this record to show both knowledge and intent than "mere passing."

Appellant is an experienced real estate investor and developer, doing business as Parks Realty Company and other entities. For several years his many transactions were closed by Southwest Land Title Co. in Irving (Southwest). As a matter of fact, that Irving office is located on ground floor of Parks Building, built by and named for appellant. In March 1972 he was obligated by a promissory note in original amount of $55,000 to Civic Savings and Loan Association (Civic Savings) also in Irving, secured by deed of trust to Hubert Owens, executed by appellant in October 1970.

Civic Savings does not prepare papers such as deeds of trust and releases; it gives closing instructions. According its purport State's Exhibit 11, "Release of Lien (By Corporation)," was executed by Owens, attested by Jean Schrang and acknowledged by Owens before Linda Smith—all on March 21, 1972. That date and other information on the release form was typed in office of Southwest by Priscilla Lewis, secretary for its title attorney.[2] At top of the paper is "V54287–pl [pl for

Priscilla Lewis] Rec. $1.50." On the back it bears a date and time stamp by Dallas County Clerk of April 13, 1972 at 12:14 PM; it is also certified to be a true copy by county clerk on April 14, 1972; also stamped thereon are "Southwest Land Title Co." and its Irving Post Office address.

State's Exhibit 13 is a deed of trust to several named trustees to secure Oak Cliff Savings and Loan Association (Oak Cliff Savings) in payment of its $60,000 loan to appellant. In upper left margin is a handwritten notation "V54287 Rec. 9.00." It shows appellant executed it April 7, 1972; he acknowledged it April 12, 1972 before Peggy Francis. Therein appellant covenanted and agreed, *inter alia*, that he had "a good and merchantable title in fee simple to the premises hereby conveyed, *free and clear from all encumbrances except the debt secured hereby....*"

Peggy Francis, a "closer" for Southwest, identified "V54287" as the number of a file opened and kept in Irving office of Southwest, and other notation as indicating amount of recording fee to be paid; file contained papers relating to a $60,000 loan being made to appellant by Oak Cliff Savings, including a title opinion pointing out there was then an outstanding deed of trust in favor of Civic Savings securing its $55,000 loan to appellant. Francis could not issue a mortgagee's title policy or close the transaction without a proper release of lien, but there was a handwritten notation someone made on the opinion that it had been released. Southwest places on borrower the responsibility to obtain and produce release of an extant lien, or there would be no closing. The release here was not signed by anyone while in Southwest, and though she did not know how it came about, State's Exhibit 11 was in file V54287 on April 12, 1972, when she "closed" the loan transaction. As well as taking his acknowledgement to the deed of trust in

filing or causing or directing to be filed [or] recorded in any office of record ... any false and forged document *knowing* the same to be false and forged." Causing or directing a release to be filed or recorded is broad enough to embrace, as article 1008 provides, "the sending through the mails or by express, or in any other way."

2. However, a comparison of State's Exhibit 11 with Defendant's Exhibit 2, file copy of former, reveals neither block number, correct title of Schrang in body of release, name of Hubert Owens nor date in acknowledgement were typed in by her; they had to be added later by handprinting "ASST" and by typing other data on what is manifestly a different typewriter.

favor of Oak Cliff Savings, she delivered to appellant a title company check in amount of $57,867.06. Deducted closing costs included filing fees and premium for mortgagee's title policy. According to custom and practice, her office forwarded release and deed of trust to its downtown Dallas office, there to be transmitted to county clerk for filing and recording. Appellant endorsed payoff check "for deposit only" to account of Parks Realty, and on April 16, 1972 his bank forwarded it for payment.

All three persons whose purported signatures appear on the face of State's Exhibit 11 denied signing that release or authorizing anyone to sign it for them, and knowing who did.[3] Harry E. Felker, a qualified questioned document examiner for twenty years, stated positively that appellant and no other person had forged the signature of Linda Smith, as notary public.[4] Although in his oral argument defense counsel accepted that Felker had indeed formed an opinion, he deftly suggested reasons for jurors to reject it as unworthy of their "vote of confidence."[5]

Without evidence of extraneous unadjudicated offenses, such is condensed state of

**3.** Hubert Owens, president of Civic Savings, had known appellant for some fifteen or twenty years, not only in negotiating this particular transaction (actually renewal and extension of an existing indebtedness described in a November 1969 deed of trust, also to Owens as trustee) and three or four others, but also in doing civic work together in Irving "and on the council and so on." He never agreed to release lien provided by this deed of trust to him as trustee. Jean Schrang was assistant secretary and cashier; she too was familiar with appellant through his dealings with Civic Savings over several years. Similarly, Linda Smith as an employee in its loan office.

**4.** The majority opinion says counsel for appellant "was able to elicit ... the fact that [Felker] had no formal training in handwriting analysis, that he was paid by the State and that he had testified in fifty cases, each time as a witness for the State." At 741. Bosh!

While the *prosecutor* was proving up qualifications, training and experience, Felker said there was not any school or college that actually teaches examination of questioned documents (in the sense of specific courses or degree), but that instruction given is "within the Criminal Justice Courts [sic—probably "course"], police science courses or something of this nature." (S.F. 668). In the second question and follow ups, he said he worked in physical evidence section of The Southwest Institute of Forensic Science, formerly known in Dallas as "Crime Lab or Criminal Investigation Laboratory," a senior document examiner specializing in examining questioned documents submitted through the criminal justice system (S.F. 665–666); his salary is paid by Dallas County (S.F. 666); he qualified as a questioned documents examiner in 1958 while employed as a special agent of the Kansas Bureau of Investigation, retiring in 1969.

For his part, counsel for appellant, acknowledging he was exploring much the same ground, was able to bring out new items: first, that Felker had a bachelor's degree in police science and administration, earning some 160 college and university hours; second, that he qualified as questioned document examiner when his credentials were accepted by a Kansas court in 1958; third, that after his retirement in Kansas, Felker was employed for three years in Arlington as "an instructor in criminalistics" at North Central Texas Police Academy; and that he had testified on behalf of the Dallas District Attorney "probably fifty times." Counsel then initiated a long discussion about "handwriting comparison and analysis;" had him make written notations on a legal pad of elements of a handwriting examination, intending to offer his writings as an exhibit, until an objection by the prosecutor, that counsel was taking a deposition in court, was sustained; drew from him that in making comparisons of characteristics Felker did not make written notes of his observations; finally touching only slightly "for example" on State's Exhibit 11 (S.F. 715–717). He ended his crossexamination with this poser:

"Q. At the conclusion then of your examination, you then would reach some opinion, the opinion of which you have expressed to the Ladies and Gentlemen of this jury in response to [prosecutor's] questions; is that correct?
A. That is correct."

**5.** The tenor of defense counsel's oral argument regarding testimony of Felker is that "it is only his opinion," and jurors are obligated to "determine whether or not it is well founded, whether or not the judgements are accurate or correct."

"I am not talking about Mr. Felker lying to you, I believe and there is no question in my mind that was his personal belief and his opinion and he wouldn't come down here and testify to you if he didn't think he as right but remember your responsibility as the last barrier between the prosecution and the defense is to look at that opinion and to determine whether or not it is well founded, look at his judgement, look at his conclusions."
Counsel then reprised "what ... we know about Mr. Felker" from background testimony summarized above, naturally giving it defensive slant; he faulted Felker for his methodology

evidence pertaining to allegations in the indictment. Is it sufficient for a rational jury to find that appellant knew State's Exhibit 11 was false and forged and that he uttered it with intent to defraud?

That the release is false and forged is not disputed. The State believes it had to prove appellant knew Owens' signature had been forged; appellant's position is that evidence is insufficient to prove both he knew release was false and forged and uttered it with intent to defraud. The majority opinion points out that such cannot be sustained by showing "mere passing of a forged instrument," and says, "Standing alone, the expert opinion ... was not strong evidence [of any matter the State was required to prove]." But it does not stand alone, given other circumstantial evidence of more than "mere passing."

In early 1972 appellant's debt to Civic Savings was secured by a deed of trust to certain real property he owned. On April 12, appellant acknowledged a deed of trust to Oak Cliff Savings, and received from Southwest its check in the amount of $57,-867.06; he endorsed and deposited that check in his bank account. Peggy Francis is not the tooth fairy. A man of considerable experience in financing real estate transactions, appellant had every reason to know he was not rightly entitled to any sum of money from that particular transaction.

A financial institution ordinarily will not agree to lend money to an individual borrower with payment secured by deed of trust to real property unless borrower has clear title in fee simple. When there is an outstanding promissory note also secured by deed of trust to same property, lien thereby created must be released by holder of that note. If he does not take them himself, a borrower must at least generate moves by others to produce a valid release of lien.

Thus on March 21, Lewis, secretary for Southwest's title attorney, did not suddenly decide on her own initiative to select a form of release by a corporation, turn to her typewriter and proceed to type in a new file number and most all relevant data thereon, supplying an execution date of March 21. By its terms Civic Savings released "deed of trust & all other liens" existing on his real property described in October 1970 deed of trust to Owens. Of course, it must be properly executed and acknowledged to become effective. The release form was not signed by any person while in office of Southwest then or later.

A borrower is responsible for securing a valid release of existing lien. Who but appellant should and could approach his lender, friend and civic coworker to propose Owens' releasing a lien securing his own personal indebtedness. A clear inference is that after Lewis prepared it, the partially completed but unexecuted release form came into possession of appellant so that he could have appropriate officers of Civic Savings execute it. However, it is undisputed neither appellant nor anyone on his behalf obtained signatures of Owens and Schrang.

Later one or more persons printed "ASST" ahead of Secretary to complete Schrang's corporate title, and on a different typewriter awkwardly typed a block number for full description of the real property, typed in the name "Hubert Owens" on acknowledgement, inserted "21" as date in March it was taken—that being the same day Lewis prepared and dated it for execution—forged three signatures and affixed a notary seal. Thus it purports to be a proper and valid release by Civic Savings as of March 21, and could be represented as such.

However, as president of Civic Savings, Owens never agreed to release its deed of trust; neither he nor Schrang signed State's Exhibit 11; Smith did not sign as notary public. Yet, sometime before April 12 closing, a fully completed and purportedly executed and acknowledged release found its way to Southwest and into file V54287.

and prosecution for failure to present exhibits illustrating common characteristics of known handwriting and alleged forged signatures for edification of jurors; he concluded, "That opinion is not worthy of your vote of confidence based upon the evidence you have heard."

Meanwhile, on April 7, 1972, appellant executed a deed of trust in favor of Oak Cliff Savings conveying identical real property described in State's Exhibit 11. That means he had previously met with a loan officer of Oak Cliff Savings, and they discussed terms and conditions of a $60,000 transaction. If not specifically mentioned, by experience, appellant knew he would be required to represent that he had good title to real property securing payment, and that it is "free and clear from all encumbrances except the debt secured hereby." The deed of trust he signed April 7 expressly so provides.[6] Thus, the only way to demonstrate of record removal of existing encumbrance was for Owens to execute release of prior lien. But since he knew Owens had never agreed to release it, appellant also had to know his property was still encumbered by deed of trust to Owens for benefit of Civic Savings, just as title opinion for Southwest pointed out.

An April 7 commitment by Oak Cliff Saving to loan appellant $60,000 is worthless so long as his deed of trust in favor of Civic Savings is extant. Within five days State's Exhibit 11 shows up at Southwest in File V54287.

From circumstantial evidence thus far analyzed a rational jury could reasonably believe and find that appellant alone or with incidental help completed the bogus release and transmitted it to Southwest. There is no other reasonable hypothesis. Expert testimony from Felker that appellant forged name of Linda Smith to its acknowledgement serves to confirm that belief and finding. It demonstrates that appellant actually possessed the partially completed release form; that he knew Owens had not acknowledged "he executed [the release] as the act of [Civic Savings] for the purposes and considerations therein expressed;" that he knew Linda Smith had not taken an acknowledgment from Owens

on March 21 or any other day and affix her notary seal. In short, knowing it was false and forged, he relinquished possession of the bogus release to file V54287 so it would serve its intended purpose and objective.

Closing a real estate transaction by a title company "closer" must be arranged: a convenient date and hour are set for parties whose presence is needed—here only appellant. When he appeared April 12, if he did not already know it, he soon surely understood State's Exhibit 11 was then in file V54287, else Francis would not be closing his transaction with Oak Cliff Savings. He acknowledged to Francis that he had executed deed of trust to trustees for Oak Cliff Savings "for the purposes and consideration therein expressed," knowing his representation therein that real property securing payment of described promissory note was false because that property was *not* "free and clear from all encumbrances." Finally, he accepted a check representing proceeds of the transaction and promptly deposited to his own bank account. Compare *Decherd v. State*, 104 Tex.Cr.R. 105, 283 S.W. 168, at 170 (1926).

When appellant actively carried out his part of closing the transaction, he knew from custom and practice State's Exhibits 11 and 13 would be routinely forwarded to office of county clerk for filing and recording, and they were. The evidence is sufficient to show that appellant uttered State's Exhibit 11 with intent to defraud. See *Sheffield v. State*, 371 S.W.2d 49 (Tex.Cr. App.1963) (Opinion on Rehearing, at 55); see also *Sheffield v. State*, 165 Tex.Cr.R. 354, 307 S.W.2d 100, 104 (1957).

Therefore, to say that "probative value of the extraneous offense was very great, [and] very nearly essential to proving the State's case in chief," as majority opinion does at page 741, is incorrect. The same expert whose testimony, as weighed in majority opinion, was less than "not strong

---

**6.** On preprinted endorsement fold of that form is a logo alongside "Oak Cliff Savings," below which appear "DEED OF TRUST," blanks for names of each party, "Benefit of Oak Cliff Savings and Loan Association," blanks for filing and recording data by county clerk and, finally a printed direction to "Return To" Oak Cliff Savings. That it does not bear a typed file number of Southwest and initials "pl" suggests the deed of trust was not prepared by Southwest, and file number and fee notation were later added by hand. In sum, State's Exhibit 13 is a personalized Oak Cliff Savings form, probably completed by its agent.

evidence" to show culpability in the primary offense, is essentially to the same effect regarding extraneous unadjudicated offenses. Repetition of what is regarded as weak opinion testimony will not serve any better to establish intent. Correctly analyzed the majority opinion is holding "propensity evidence" is properly admitted because the prosecution has such a dearth of evidence to support allegations of its indictment that otherwise an accused would be entitled to a directed verdict of acquittal.

I respectfully dissent.

MILLER and DUNCAN, JJ., join.