

# IN THE
# TENTH COURT OF APPEALS

### No. 10-07-00327-CR

BRINJIT VELU,

Appellant

v.

THE STATE OF TEXAS,

Appellee

From the 272nd District Court
Brazos County, Texas
Trial Court No. 06-00706-CRF-272

## MEMORANDUM OPINION

A jury convicted Brinjit Velu of forgery and the trial court assessed his punishment at 180 days' confinement in a state jail, suspended for two years. Velu challenges: (1) the legal and factual sufficiency of the evidence to support his conviction; (2) the admission of extraneous offense evidence; (3) the admission of a business records affidavit; and (4) the inclusion of an allegedly erroneous application paragraph in the jury charge. We affirm.

**FACTUAL BACKGROUND**

Velu, an Indian national and master's student, met Lizzy Kelly on an internet dating website. Kelly claimed to be a Pennsylvania resident studying in Nigeria. Velu became interested in Kelly. At some point, Velu agreed to cash a check for Kelly and wire her the money. Velu received the cashier's check from Kelly's aunt. In India, cashier's checks are the "most secure financial instruments," so Velu did not suspect that the check might be counterfeit. He took the check to Bank of America, where he maintained an account. The bank accepted the check, but later returned the check with a letter advising Velu that the check was counterfeit. The bank closed Velu's account.

Kelly told Velu that her aunt had stopped payment on the check. Velu believed Kelly and agreed to cash a second check from Kelly's aunt. Kelly instructed Velu to take the check to a check-cashing point and send her the money. Velu took the check to Mr. Payroll, believing that Mr. Payroll was in a better position to verify the check's authenticity and tell him whether the check was "genuine or fake."

Dorothy Johnson received the check from Velu. Johnson noticed that the check contained handwriting instead of machine printing and omitted the payor's telephone number. Velu told Johnson that he was cashing the check for a friend and needed to wire the money. Johnson, aware of a Nigerian check-cashing scam, became suspicious. Upon further questioning, Velu motioned for Johnson to "quiet down." He then told Johnson that an aunt had asked him to cash the check and wire the money to her niece in Nigeria. After contacting the bank, Johnson discovered that the check was counterfeit and contacted police.

Officers Tom Jagielski and Kevin Roby spoke with Velu at Mr. Payroll. Velu told both officers that he had received the check from a friend in Florida and that this was the second of two checks he had received from this friend. He deposited the first check into his bank account, but subsequently learned that the check was counterfeit. The bank returned the check, closed his account, and returned the remaining funds to him. Velu further told Roby that he received a letter with the second check instructing him to cash the check at a "check-cashing place[]" instead of depositing the check into his own bank account. He told Roby that he planned to send the money to a friend in Nigeria. Velu also told Roby that he thought the money might be stolen. Velu told Jagielski that he did not deposit the second check into his account because he thought the check was probably bad since it was written on the same bank by the same person as the first check. He did not want his new account to be closed.

Velu told investigator Thomas Reitmeyer that he received the check from his friend, went to Mr. Payroll to cash the check, and planned to wire the money to a friend in Nigeria. He mentioned Kelly, explaining that she had initially asked him for money, but he had no money to give. Kelly then told Velu that her mother's friend would send him a check and instructed Velu to deposit the check and wire her the money. Velu said that the first check was post-marked Ireland and written on a bank in Florida. He told Reitmeyer that he later learned that the check was counterfeit. Kelly told him that her friend's mother had stopped payment on the check and would send another check.

At a second interview, Velu offered to log into his email account and show Reitmeyer the emails from Kelly. Velu refused to consent to a forensic search of his

computer.  After obtaining a search warrant, Reitmeyer recovered Velu's computer, a letter from Velu's bank advising him about the counterfeit check and the closure of his account, Western Union receipts, the first counterfeit check, and a bank statement.

Detective Paul Price conducted the forensic search of Velu's computer.  Price found an email and a chat log involving Kelly.  The email contained wiring instructions.  In the chat log, Kelly told Velu that the first check was not cancelled.  She asked Velu to cash the check at a check-cashing point, deduct $250 for himself, the Western Union charges, and the check-cashing fee, and send her the remaining funds.  Velu agreed.  Price found evidence that Velu had been visiting several different dating websites.  Price found no evidence that Velu was trying to hide something.

After his release from jail, Velu told Kelly that her aunt sent a counterfeit check and that the police were going to come after her.  Kelly logged off the computer.  Velu later discovered that Kelly had several internet profiles, using the same photograph, in different locations across the United States.

## LEGAL AND FACTUAL SUFFICIENCY

In his first point, Velu contends that the evidence is legally and factually insufficient to show that he acted with the intent to defraud or harm another or knew that the check was forged.

### Standards of Review

Under legal sufficiency review, we determine whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Curry v. State*,

30 S.W.3d 394, 406 (Tex. Crim. App. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)).  We do not resolve any conflict of fact or assign credibility to the witnesses, as this was the function of the trier of fact.  *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *see also Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991).  Inconsistencies in the evidence are resolved in favor of the verdict.  *Curry*, 30 S.W.3d at 406; *Matson*, 819 S.W.2d at 843.

Under factual sufficiency review, we ask whether a neutral review of all the evidence demonstrates that the proof of guilt is so weak or that conflicting evidence is so strong as to render the jury's verdict clearly wrong and manifestly unjust.  *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  We review the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compare it with the evidence that tends to disprove that fact.  *Johnson*, 23 S.W.3d at 7.  We do not indulge in inferences or confine our view to evidence favoring one side.  Rather, we look at all the evidence on both sides and then make a predominantly intuitive judgment.  *Id.*

**Analysis**

In order to prove the offense of forgery by passing, the State must show that the defendant: (1) with intent to defraud or harm another (2) passed (3) a writing (4) that purported to be the act of another and (5) that other persons did not authorize the act.  *See* TEX. PEN. CODE ANN. § 32.21(a), (b) (Vernon Supp. 2008); *Williams v. State*, 688 S.W.2d 486, 488 (Tex. Crim. App. 1985).  Intent to defraud or harm requires proof of

knowledge that the instrument is forged. *See Williams*, 688 S.W.2d at 488. Intent may be established by circumstantial evidence. *Id*. Intent may be inferred if the State establishes that the defendant knew the instrument was forged. *See Beaty v. State*, 156 S.W.3d 905, 909 (Tex. App.—Beaumont 2005, no pet.).

The State relied on several facts to establish Velu's intent and knowledge. Velu contends that none of these facts support his conviction because each fact is ambiguous.

First, the State relied on the extraneous counterfeit check. Velu contends that the two checks are dissimilar: the first check was handwritten, the second check was typed, each check had a different payor, and each check was written on a different account and different bank. However, both checks involve similar transactions. The two checks were from the same source, Kelly was the intended recipient of the funds from both checks, both checks were for $3,000, and Velu planned to wire the funds from both checks. In fact, Reitmeyer opined that, because the bank advised Velu that the first check was counterfeit, a "reasonable person would believe that he had prior knowledge that there was something wrong and that that check, in all likelihood, was false and should not be attempted to be cashed." He added that if a person with that knowledge still attempts to cash the check, then it becomes "kind of a 'Well, let's see what happens' type of situation." The first counterfeit check is evidence of intent and knowledge. *See Laws v. State*, No. 14-00-01093-CR, 2001 Tex. App. LEXIS 7576, at *15 (Tex. App.— Houston [14th Dist.] Nov. 8, 2001, no pet.) (not designated for publication) (despite defendant's claim that he did not know a check was forged, he had engaged in a similar scheme before committing the charged offense).

Second, the State relied on Velu's conflicting stories: he was cashing the check for a friend, he was cashing the check for an aunt to send to her niece in Nigeria, he received the money from a friend in Florida, and he received the check from Kelly's mother's friend in Ireland. Velu contends that "[g]iven a liberal interpretation of [his] explanations about how he received the check, his stories were consistent with one another." Yet, the jury was entitled to consider any conflicts in Velu's story as evidence of guilt and bore the burden of resolving such conflicts either for or against him. *See Kemmerer v. State*, 113 S.W.3d 513, 516 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ("jury could have viewed appellant's changing versions of the incident as evidence of guilt."); *see also Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008) (the jury "may choose to believe some testimony and disbelieve other testimony"); *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (it is within the exclusive province of the jury to reconcile conflicts in the evidence).

Third, Velu motioned for Johnson to be quiet when she questioned him about the check. Velu contends that the meaning behind his gestures is "inconclusive and speculative." He testified that he was attempting to clarify things with Johnson, not silence her. Johnson found Velu's behavior unusual. Because intent and knowledge may be inferred from the defendant's acts, words, and conduct at the time of the offense, the jury was entitled to consider Velu's gestures towards Johnson. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

Fourth, the State challenged Velu's failure to produce "love letters" evidencing a relationship with Kelly. Velu argues that the lack of such letters does not establish the

absence of an "important relationship." Velu testified that he cared about Kelly, was interested in Kelly, and anticipated entering a "committed relationship" with Kelly. He also testified that Kelly sent him photographs and wanted to meet him. Even without written evidence of a relationship, the jury could have found that such a relationship did exist. As the sole judge of the weight and credibility of the evidence, the jury bore the burden of deciding what to believe. *See Lancon*, 253 S.W.3d at 707; *see also Wyatt*, 23 S.W.3d at 30.

Fifth, the State argued that Velu benefited from the transaction. In the chat log, Kelly instructed Velu to retain $250 for himself, but Velu testified that he did not benefit financially from the transactions. However, it was not necessary that Velu reap a benefit. *See Landry v. State*, 583 S.W.2d 620, 623 (Tex. Crim. App. 1979) ("'[P]ass' in the forgery statute means to offer the forged instrument, and it does not require a showing that the defendant actually received consideration in exchange for the check."); *see also McGee v. State*, 681 S.W.2d 31 (Tex. Crim. App. 1984) (same); *Lee v. State*, No. 06-07-00137-CR, 2008 Tex. App. LEXIS 1048, at *3-4 (Tex. App.—Texarkana Feb. 14, 2008, no pet.) (not designated for publication) (same).

Finally, the State emphasized Velu's statements to police that he thought the check might be bad and the money might be stolen. Velu contends that he did not know, but merely suspected, that the check was counterfeit. He denied telling the officers that the second check was written on the same account by the same person. He did not want to risk the closing of his bank account and believed that Mr. Payroll would tell him whether the check was counterfeit. He maintains that he was merely a "victim

of a check-cashing scam in which good natured and honest people were deceived by online swindlers into cashing counterfeit checks and sending the money abroad." According to Velu, his statements indicate nothing more than criminal negligence. We disagree.

Velu's statements are evidence of guilt, suggesting an awareness of the check's fraudulent nature. *See Laws*, 2001 Tex. App. LEXIS 7576, at *13 (defendant admitted taking the check to the bank to verify its validity). Velu had already attempted to cash a forged check from the same source and he knew that this first check was forged. As Reitmeyer testified, this fact is sufficient to cause a reasonable person to conclude that the second check was also fraudulent and should not be cashed. *See id.* at *15 (circumstances suggested that genuineness of check should have been questioned). Bank of America knew about the previous forged check and had already closed one of Velu's accounts. The jury could reasonably conclude that Velu, an intelligent man and a masters student in petroleum engineering, was not the victim of an internet scam, but knew that this second check was also fraudulent and chose to cash the check at Mr. Payroll where he perceived a lesser risk of being caught. His unusual behavior towards Johnson and conflicting stories support such a conclusion. *See Hart*, 89 S.W.3d at 64; *see also Kemmerer*, 113 S.W.3d at 516; *Laws*, 2001 Tex. App. LEXIS 7576 , at *12 (knowledge can be established by "suspicious circumstances", including nervous and unusual behavior). Additionally, the check bore visible signs of fraud, such as the handwriting and lack of contact information for the payor. Knowing the check to be fraudulent, but

making the conscious decision to attempt to cash it, evidences intent to defraud or harm another. *See Beaty*, 156 S.W.3d at 909.

Viewing all the evidence in the light most favorable to the verdict, the jury could reasonably conclude, beyond a reasonable doubt, that Velu committed the offense of forgery. *See Curry*, 30 S.W.3d at 406. The proof of guilt is not so weak nor the conflicting evidence so strong as to render the jury's verdict clearly wrong or manifestly unjust. *See Watson*, 204 S.W.3d at 414-15; *see also Johnson*, 23 S.W.3d at 11. Because the evidence is legally and factually sufficient to sustain Velu's conviction, we overrule his first point of error.

## EXTRANEOUS OFFENSE EVIDENCE

In his second point, Velu challenges the admission of (1) evidence regarding the first counterfeit check; and (2) Western Union transfer receipts. We review a trial court's admission of extraneous offense evidence for abuse of discretion. *See Page v. State*, 213 S.W.3d 332, 337 (Tex. Crim. App. 2006).

### The Challenged Evidence

Outside the jury's presence, the State sought to offer the first counterfeit check that Velu cashed at Bank of America, arguing that the evidence establishes intent and knowledge. For these same reasons, the State sought to admit evidence of several wire transfers that Velu sent to individuals in the United Kingdom in the seven months preceding the offense. Velu objected that the evidence is "prejudicial and outweighs the probative value." *See* TEX. R. EVID. 403. The trial court overruled the objection.

## Extraneous Counterfeit Check

Although Velu had previously objected to admission of the extraneous check, when the State offered the check into evidence, Velu had "[n]o objection." Under these circumstances, he has failed to preserve any complaint regarding admission of the check. *See Swain v. State*, 181 S.W.3d 359, 368 (Tex. Crim. App. 2005) ("The affirmative acceptance of [] previously challenged evidence waived any error in its admission."); *see also Grisso v. State*, 264 S.W.3d 351, 354 (Tex. App.—Waco 2008, no pet.) (Where "defense counsel affirmatively represents that the defendant has 'no objection' to the evidence, any error in the admission of the evidence is waived even if the error had been previously preserved by a suppression motion and adverse ruling.").

## Western Union Transfer Receipts

In addition to his Rule 403 objection outside the jury's presence, when the State offered the receipts into evidence, Velu objected on the basis of "relevance." *See* TEX. R. EVID. 401. The trial court overruled the objection.

Relevant evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Extraneous offense evidence may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b). This list is "neither mutually exclusive nor collectively exhaustive." *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). Extraneous offense evidence is admissible where (1) it is relevant to a fact of consequence in the case apart from its tendency to prove conduct in conformity

with character; and (2) the probative value of the evidence is sufficiently strong so that it is not substantially outweighed by unfair prejudice. *Johnston v. State*, 145 S.W.3d 215, 220 (Tex. Crim. App. 2004); *see* TEX. R. EVID. 403 (Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice).

Velu contends that this evidence was admitted to tie him to a Nigerian check-cashing scam that the State never established or explained. The State argues that the receipts are relevant to intent and knowledge because they show that: (1) Velu's "intention in the instant case -- to wire the money internationally to individuals he had never met -- was not an isolated occurrence;" and (2) Velu "regularly wired large sums of money to individuals in foreign countries," specifically those "in the same area from which the fraudulent checks originated."[1] The State relies on *Parks v. State*, 746 S.W.2d 738 (Tex. Crim. App. 1987) and *Beasley v. State*, No. 01-02-00942-CR, 2004 Tex. App. LEXIS 6058 (Tex. App.—Houston [1st Dist.] July 8, 2004, pet. ref'd) (not designated for publication), to support its position.

In *Parks*, the defendant was convicted of forging a release of lien. *See Parks*, 746 S.W.2d at 738-39. The State introduced evidence of two earlier forged releases. *Id*. The Court of Criminal Appeals noted, "Establishing intent in [forgery] cases is so crucial and so difficult to do that, as a practical matter, evidence of extraneous offenses is nearly always admissible." *Id*. at 740. The forged releases were relevant because they: (1) were "very nearly identical" to the charged offense; and (2) "showed that it was

---

[1] The jury charge limited the jury's consideration of the evidence to intent and knowledge.

more likely than not that [Parks] had formed an intent to commit the offense pursuant to a general plan to enrich himself." *Id*. at 741.

In *Beasley*, the defendant opened an account with Union Planters Bank, deposited several counterfeit checks, and withdrew the funds. *See Beasley*, 2004 Tex. App. LEXIS 6058, at *1-2. He was convicted of felony aggregate theft. *Id*. at *1. The State introduced evidence that Beasley had used this scheme at another bank. *Id*. at *18. Beasley argued that he "innocently received the counterfeit checks" and deposited them at his bank. *Id*. at *19. The First Court found the extraneous offense evidence relevant "because it makes the innocent deposit of checks at Planter's bank less likely." *Id*. at *19-21.

Unlike *Parks* and *Beasley*, the extraneous offense evidence in this case is not virtually identical to the charged offense. Although the extraneous offense and the charged offense both involve wire transfers of money to individuals overseas, there is no evidence that the extraneous transfers involve funds obtained from a forged check. The only evidence regarding the source of these funds came from Velu, who testified that he obtained the money from legitimate sources, *i.e.*, his parents or his employment with the engineering department at his university. The State offered no evidence suggesting the funds for these transfers came from an illegal source. *See Feldman v. State*, 71 S.W.3d 738, 754 (Tex. Crim. App. 2002) (the proponent of extraneous offense evidence must show that the evidence has relevance apart from character conformity). Thus, the extraneous transfer receipts were not relevant to Velu's intent to defraud or harm another or his knowledge that the check was forged. The trial court abused its discretion by admitting this extraneous offense evidence.

We must now determine whether this error affected Velu's substantial rights, *i.e.*, whether the "the error had a substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see* TEX. R. APP. P. 44.2(b). We "consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory of the case, any defensive theories, closing arguments, voir dire, and the extent to which the State emphasized the erroneously admitted evidence. *See id.* at 355-56. "[S]ubstantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Id*. at 355.

Velu testified that, in the seven months before the offense, he was contacted as a winner of the online lottery in the United Kingdom. During that period, he sent several wire transfers to lottery personnel. Velu testified that these transfers represent fees that he was told to pay in order to recover his winnings. Reitmeyer found the receipts suspicious because Velu had mentioned that the counterfeit check came from an individual in Ireland or the United Kingdom. Although he opined that the transfers indicated "prior activity" or "prior knowledge," Reitmeyer found nothing illegal associated with the receipts. Price found emails to individuals in the United Kingdom, but found no evidence that they were related to the forgery case.

Price did find evidence that Velu was experiencing financial difficulties, which he found contradictory in light of the transfers. Specifically, Price located only one bank account that never contained more than $200 in the five month period before the offense. He also found numerous email solicitations for credit cards and loans in excess of the average college student. Velu, however, testified that he maintained other bank accounts in addition to the one identified by Price. Velu used the account Price referred to for contacting his family in India; thus, he kept only a small amount of money in the account. Velu testified that he used money from his parents and his employment to transfer the funds to the United Kingdom.

During closing argument, the State questioned why Velu did not have $250 to send to Kelly when he had been sending $8,000 in wire transfers to the United Kingdom. The State expected the defense to argue that Velu was naïve:

> If that's the case, his suspicions should have been raised to the point in December of 2005, when he's getting counterfeit checks. He's supposedly sent money over to the Lucky Lottery business, but he's not getting any money back? He's wiring $8,000 of money and not getting any back, but he's getting checks in the mail from a girl that doesn't write him any letters? That doesn't make any sense, people. It's because he's guilty. He's -- he knew what was going on. His intent is clear after you get the first check, and we ask that you find him guilty.

The defense argued that it is not illegal to wire money, the wire transfers did not connect Velu to any criminal activity, and the receipts were merely admitted to show that Velu had knowledge that the check was forged. The defense added that Velu thought he had won the lottery, but was tricked into believing that he had to pay money in order to receive his winnings. In rebuttal, the State argued that Velu "had

been had a few times," which should have alerted him to "watch out," but he became a "willing participant." The State argued that this was not "the first check with no other history of [Velu] having any financial obligations, sending money, things to cue him in that 'This is wrong, I know this is wrong.'"

As the defense noted in closing, the wire transfers are not evidence of any illegal activity. The record contains no evidence suggesting that the money Velu wired to the United Kingdom was obtained illegally or, more specifically, came from a forged check. Rather, Velu identified legitimate sources of the funds and Reitmeyer found no evidence that the transfers were linked to criminal activity. Neither does the record connect the wire transfers to the forgery case in any way. The transfers indicate nothing more than the fact that Velu was duped into believing he had won the online lottery.

Moreover, we have already found the evidence legally and factually sufficient to sustain Velu's conviction. It is unlikely that evidence of the wire transfers, which were unrelated to either criminal activity or the present forgery case, had a substantial or injurious effect or influence on the jury's verdict. *See Haley*, 173 S.W.3d at 518. The erroneous admission of the evidence is harmless. We overrule Velu's second point.

## BUSINESS RECORDS AFFIDAVIT

In his third point, Velu challenges the admission of a business records affidavit from the custodian of records of First Coast Community Credit Union. We review admission of this evidence for abuse of discretion. *See Jones v. State,* 944 S.W.2d 642, 651 (Tex. Crim. App. 1996).

Two letters from First Coast's member service manager and a copy of the counterfeit check were attached to the business records affidavit. According to the first letter, GP Community Federal Credit Union became First Coast in May 2003. Since that time, all cashier's checks bear the First Coast name, are not hand-written, include the President/CEO's facsimile signature, and contain a certain number sequence. The counterfeit check was written after the name change, but bore the GP name. The manager states, "[T]his is not our check, we did not issue this check and will not honor." The letter erroneously states that the $3,000 check was for $5,000. In the second letter, the manager states: "We have no record of this check number, we do not issue hand written checks and our checks have a facsimile signature."

Outside the jury's presence, Velu objected to admission of the affidavit: (1) "It's not made at or near the time of the occurrence; and also, it's swearing to a check that's a 5,000-dollar check and the check in this case is a $3,000-dollar check"; (2) "[I]t's prejudicial and irrelevant"; and (3) "[S]he's not subject to cross-examination. It's a sworn declaration that she looked at the check, and it's -- I can't cross-examine her. I think it's prejudicial against my client. It's misleading to the jury." The trial court overruled the objections, noting that the affidavit had been on file for more than fourteen days. *See* TEX. R. EVID. 902(10).

On appeal, Velu contends that admission of the affidavit violates the Confrontation Clause because he was unable to cross-examine the affiant regarding the discrepancy in the amount of the check. The State contends that Velu failed to preserve this complaint for appeal. We agree.

Velu briefly mentioned cross-examination in conjunction with his objection that the evidence is prejudicial and misleading. Appellate courts have found similar statements insufficient to preserve a Confrontation Clause complaint. *See Austin v. State*, 222 S.W.3d 801, 811 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd), *cert. denied*, __U.S.__, 128 S.Ct. 1230, 170 L.Ed.2d 79 (2008) (defendant's "reference to the inability to cross-examine the declarant" was mentioned "only in the context of making a hearsay objection."); *see also Rivera v. State*, No. 05-06-00678-CR, 2007 Tex. App. LEXIS 6508, at *15 (Tex. App.—Dallas Aug. 10, 2007, pet. ref'd) (not designated for publication) (statement that the defendant had a "right to confront his accusers" was made in the context of a hearsay objection); *Taylor v. State*, No. 06-05-00033-CR, 2006 Tex. App. LEXIS 327, at *3, 6 (Tex. App.—Texarkana Jan. 13, 2006, no pet.) (not designated for publication) (statement, made amidst a hearsay objection, that the State could "bring[] in the person so that we have the right to confront them and to cross-examine them" was a "hybrid argument" under both federal and state rules).

In *Austin*, the Fourteenth Court stated, "Even if such a minor reference to cross-examination could be construed to include a Confrontation Clause objection, '[w]hen a defendant's objection encompasses complaints under both the Texas Rules of Evidence and the Confrontation Clause, the objection is not sufficiently specific to preserve error.'" *Austin*, 222 S.W.3d at 811 (quoting *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005)). Velu's objection could be construed as one based on either the

Confrontation Clause or the Rules of Evidence. Accordingly, his third point is not preserved for appellate review.[2]

## JURY CHARGE

In his fourth point, Velu contends that the application paragraph in the jury charge was erroneous.

The indictment alleged that Velu "with intent to defraud or harm another, transfer[ed] or pass[ed] to Dorothy Johnson a forged writing, knowing such writing to be forged, and such writing had been so altered, made or completed that it purported to be the act of GP Community Federal Credit Union, who did not authorize the act, and said writing was a check…" The application paragraph states:

> Now if you find from the evidence beyond a reasonable doubt that on or about December 19, 2005 in Brazos County, Texas, the defendant, BRINJIT VELU, did, with the intent to defraud or harm another, transfer or pass a writing to Dorothy Johnson so it purported to be the act of GP Community Federal Credit Union, who did not authorize the act, and said writing was a check of the tenor set forth in the indictment, then you will find the defendant guilty.

Velu contends that the application paragraph erroneously omitted the "knowledge element" included in the indictment.

---

[2] Even had Velu's objection been preserved, the error, if any, was harmless because the same or similar testimony was introduced elsewhere without objection. *See Lasher v. State*, 202 S.W.3d 292, 295 n.1 (Tex. App.—Waco 2006, pet. ref'd); *see also Broussard v. State*, 163 S.W.3d 312, 318 (Tex. App.—Beaumont 2005, no pet.). Before admission of the affidavit, Johnson testified that cashier's checks are "usually typed all the way, except for the signature," not hand-written as the check she received from Velu. She testified that all the valid cashier's checks that she had observed were machine printed. She also testified that, unlike most cashier's checks, Velu's check did not list a telephone number for the bank. Johnson contacted the bank, which confirmed that the check was fraudulent. Velu later admitted that the check is "fake, counterfeit" having "already been confirmed at Mr. Payroll." He agreed that the bank denied authorizing the check. The record contained other evidence, besides the complained-of evidence, showing that the check was forged.

When reviewing a jury charge, we first examine the charge for error. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)). A jury charge must include all essential elements of the offense. *See Martin v. State*, 200 S.W.3d 635, 639 (Tex. Crim. App. 2006).

Knowledge is not a statutory element of the forgery offense. *See* TEX. PEN. CODE ANN. § 32.21(a), (b). Intent to defraud or harm is the culpable mental state and is established by proof of knowledge. *See Williams*, 688 S.W.2d at 488. Thus, the trial court's application paragraph alleges all the essential elements of the forgery offense. *See Martin*, 200 S.W.3d at 639; *see also Williams*, 688 S.W.2d at 488. In particular, it alleges the requisite culpable mental state, *i.e.*, intent to defraud or harm. *See Williams*, 688 S.W.2d at 488; *see also* TEX. PEN. CODE ANN. § 32.21(b); *Jones v. State*, 571 S.W.2d 191, 192-93 (Tex. Crim. App. 1978) ("An indictment that 'allege[s] that the act was committed 'with intent to defraud or harm another,' which is the essential mental element,'" but does not allege knowledge, is not fundamentally defective.). Accordingly, the charge is not erroneous. We overrule Velu's fourth point.

The judgment is affirmed.

FELIPE REYNA
Justice

Before Chief Justice Gray,
    Justice Reyna, and
    Justice Davis
Affirmed
Opinion delivered and filed February 25, 2009
Do not publish
[CR25]