Dawn Kay BEATY, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 09–04–111 CR, 09–04–118 CR.

Court of Appeals of Texas, Beaumont.

Submitted Feb. 9, 2005.

Delivered Feb. 16, 2005.

Tom Brown, Livingston, for appellant.

John S. Holleman, Criminal Dist. Atty., Jonathan Petix, Asst. Criminal Dist. Atty., Livingston, for appellee.

Before McKEITHEN, C.J., GAULTNEY and HORTON, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

Appellant, Dawn Kay Beaty, was charged under two separate indictments with having obtained controlled substances by forgery, under the provisions of Tex. Health & Safety Code Ann. § 481.129(a)(5)(A) & (B) (Vernon 2003).[1] Because one of the controlled substances was listed in Schedule II of the Controlled Substances Act, and the other controlled substance was listed in Schedule IV, appellant was facing punishment exposure for both a second degree felony and a third degree felony. *See* Tex. Health & Safety Code Ann. § 481.129(d)(1) & (2) (Vernon 2003); Tex. Health & Safety Code Ann. § 481.032 (Vernon Supp.2005).[2] A consolidated trial was conducted on both charges with the jury finding appellant guilty in each cause. As appellant elected for the trial court to assess punishment, a Pre-Sentence Investigation was ordered. Thereafter, the trial court assessed punishment in each cause at confinement in the Texas Department of Criminal Justice—Correctional Institutions Division for a term of ten years, but suspended imposition of the sentences and placed appellant on community supervision for a period of ten years. In each appeal, appellant raises the identical issue, complaining of legally insufficient evidence to sustain the convictions "in that there is no evidence that Appellant knew that the prescription form used to obtain the controlled substance was forged." For the reasons stated below, we affirm the judgments in both causes.

The record indicates that appellant brought a written prescription into the Wal–Mart store pharmacy, located in Livingston, Texas, and later picked up the

---

1. Simply entitled "Offense: Fraud," section 481.129 provides, in pertinent part:
 (a) A person commits an offense if the person knowingly:
 (5) possesses, obtains, or attempts to possess or obtain a controlled substance . . .
 (A) by misrepresentation, fraud, forgery, deception, or subterfuge; [or]
 (B) through use of a fraudulent prescription form; . . .

2. In trial cause number 17,180, appellant fraudulently obtained the generic substitute of Xanax (Alprazolam), listed in Schedule IV of the Controlled Substances Act, and also fraudulently obtained the generic substitute of Lortab (Hydrocodone), listed in Schedule II. Also, revisions to section 481.032 took effect on January 1, 2003. As these revisions have no application to the controlled substances in the instant causes, we refer to the current version of section 481.032 to lessen confusion.

medications. The prescription indicated the prescribing doctor, Achi Chary, M.D., issued it on January 22, 2003, to a "Laura Green," for "Lortab" and "Xanax." However, Dr. Chary testified at trial that he did not write the prescription to "Laura Green," and that he had never seen a "Laura Green." Dr. Chary further testified that he had seen and prescribed similar medication to appellant on January 15, 2003. Dr. Chary also testified that a blank prescription pad was stolen from his office. Therefore, anyone could have forged the "Laura Green" prescription.

The jury also heard testimony from the Wal–Mart pharmacy manager, Jeffrey Plunket. Mr. Plunket identified a Wal–Mart pharmacy signature log indicating that on January 25, 2003, appellant signed her name and produced her driver's license so that she could pick up the prescriptions for the fictitious "Laura Green." Mr. Plunket further stated that a pharmacist at Wal–Mart noticed "some irregularities" on the "Laura Green" prescription and called Dr. Chary's office to verify its validity. Dr. Chary's office informed the pharmacist that Dr. Chary did not have a patient by the name of "Laura Green." The record shows that Wal–Mart personnel filled the "Laura Green" prescriptions; appellant picked up the "Laura Green" prescriptions on January 25, 2003; and Wal–Mart personnel promptly called the police to report that the forged prescriptions for "Laura Green" had been picked up.

Sergeant Anthony Lowrie of the Polk County Sheriff's Office testified that he investigated the prescription forgery and subsequently conducted a videotaped interview with appellant. Without objection, the videotaped interview was played to the jury. During the interview, appellant initially lied to Sergeant Lowrie as to how she acquired the "Laura Green" prescrip-

tion. Appellant first told Sergeant Lowrie that a woman she knew only as "Missy" asked appellant to fill the prescriptions because she (Missy) had no identification and "Laura Green" was not present. As appellant did have identification, she agreed to get the prescriptions filled. When Sergeant Lowrie questioned the truthfulness of appellant's story, she changed the story and indicated that the prescriptions were actually for her friend, Jolynn Lawson. Appellant went on to describe her role in helping Jolynn Lawson acquire controlled substances such as hydrocodone and alprazolam. Appellant essentially admitted to having acquired her prescription on January 15, 2003, from Dr. Chary under false pretenses, and then giving Jolynn Lawson all but one of the prescribed controlled substances. During this taped interview, Sergeant Lowrie had appellant provide a handwriting sample, which indicated to Lowrie that appellant was not the person who wrote the "Laura Green" prescriptions. Appellant denied knowing the "Laura Green" prescriptions were forgeries, and stated that had she known, she would not have provided her driver's license to the Wal–Mart personnel when she picked up the controlled substances.

The State's theory of the charges against appellant can be summed up by the following direct testimony of Sergeant Lowrie:

Q.[State] What role did Dawn Kay Beaty perform in this investigation?

A.[Lowrie] She filled a fraudulent prescription and dropped the pills off to somebody. And during the interview, she—she admitted that she did not know the person on the prescription, that she's filled several of these prescriptions before, that she did not know any of the people on the prescriptions.

Q. And, in fact, did she state that, you know, she was filling these prescriptions for Jolynn Lawson?

A. Yes, she did.

Q. And that she didn't know who Laura Green was?

A. She did not know who Laura Green was. She thought it was an aunt.

Q. And that she's done this on many, many times in the past?

A. Yes, sir.

Q. Filled prescriptions for Jolynn Lawson for other people?

A. Yes, sir.

Q. Now, just speaking to you as a citizen, hypothetically if your best friend came up to you and gave you a prescription for someone that you didn't know, would you go and fill that prescription?

A. No, I would not.

Q. Why wouldn't you?

A. It just would seem suspicious to me.

Q. And did Dawn Kay Beaty also admit to going to the doctor and getting a script filled for herself on January 15th, 2003?

A. Well, she admitted she went and had a prescription filled and it was in her name. She did give those to the—to Ms. Lawson, also.

Q. And that's what she told you, that she gave those in her name to Ms. Lawson?

A. Yes. They—Ms. Lawson had actually paid for the doctor visit for the pills.

Sergeant Lowrie further testified that he made telephone contact with Jolynn Lawson and she agreed to come to the Polk County Sheriff's Office to meet with him. Ms. Lawson advised Lowrie that "she had no idea what Ms. Beaty was talking about, that those are Ms. Beaty's pills, and it went on from there." At that point, Sergeant Lowrie felt he did not have enough evidence to file charges on Ms. Lawson.

■■■ Mental states are almost always inferred from acts and words. *Moore v. State,* 969 S.W.2d 4, 10 (Tex.Crim.App. 1998). "Mental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs." *Id.* (quoting *Hernandez v. State,* 819 S.W.2d 806, 810 (Tex.Crim.App.1991)). A defendant's mental state is "concealed within his own mind and can only be determined from his words, acts, and conduct." *Id.* (quoting *Norwood v. State,* 135 Tex.Crim. 406, 120 S.W.2d 806, 809 (1938)). The jury in the instant cases was instructed that a person acts "knowingly" or "with knowledge," with respect to the nature of his conduct when he is aware of the nature of his conduct. *See* Tex. Pen.Code Ann. § 6.03(b) (Vernon 2003). Culpable mental state is most commonly grounded upon inferences to be drawn by the factfinder from the attendant circumstances. *Lane v. State,* 763 S.W.2d 785, 787 (Tex.Crim. App.1989). Thus, the jury may infer intent or knowledge from any facts in evidence that tend to prove the existence of such a culpable mental state. *Hernandez,* 819 S.W.2d at 810.

An essential element of the instant offenses is the *knowing* misrepresentation, fraud, forgery, deception, subterfuge, or *knowing* use of a fraudulent prescription form to possess or attempt to possess the controlled substances in question. As the culpable mental state for this offense is similar to that required for conviction under the forgery provisions of the Texas Penal Code, we look to such cases for guidance. *See* Tex. Pen.Code Ann. § 32.21(a)(1)(A) & (B), (b) (Vernon Supp.

2005).[3] In *Griffin v. State*, 908 S.W.2d 624 (Tex.App.-Beaumont 1995, no pet.), we reversed the conviction and ordered acquittal of a defendant convicted of forgery, finding the evidence legally insufficient to prove he intended to "defraud or harm another" when he presented a forged check made payable to him. *Id.* at 626, 628. As we noted, in a forgery case, the culpable mental state requires proof of knowledge that the check is forged, and if the State proves that an actor has knowledge that a particular check is forged, proof of intent to defraud is inferred. *Id.* at 627 (citing *Williams v. State*, 688 S.W.2d 486, 488 (Tex.Crim.App.1985)).

In *Griffin*, after we reviewed the record evidence for "knowledge" of the forgery, we looked to other cases addressing the issue and noted that "[i]n each opinion sustaining a forgery conviction, there has been some additional evidence of 'suspicious circumstances' which show that the defendant knowingly and intentionally passed the forged check." *Griffin*, 908 S.W.2d at 627 (quoting *Spencer v. State*, 700 S.W.2d 300, 302 (Tex.App.-Austin 1985, no pet.)). The first example of "suspicious circumstances" we listed was: "Where the defendant made an affirmative statement explaining possession of the check which proved false." *Griffin*, 908 S.W.2d at 627 (citing, *inter alia*, *Williams*, 688 S.W.2d at 490). The record in the instant appeal reflects that appellant was a knowing and willing participant in a scheme to acquire controlled substances having "a high degree of abuse potential." Whether the identical medications acquired on January 15, 2003, under false pretenses from Dr. Chary were turned over to Ms. Lawson or not, for whatever reason, appellant chose to implicate herself in her interview with Sergeant Lowrie in a scheme rooted in deceit and misrepresentation. More importantly, she began the interview with the false explanation as to how she acquired the forged "Laura Green" prescription and her role as merely doing a favor for "Missy." When confronted by Sergeant Lowrie with this obvious lie, appellant provided the more incriminating version of the purported events surrounding the "Laura Green" prescription. Nevertheless, she insisted she had no knowledge of the fictitious nature of the prescription while acting as a willing participant in the continued fraudulent acquisition of addictive controlled substances.

■ Appellant frames her issue as one of legal insufficiency. When we review a challenge to the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Moff v. State*, 131 S.W.3d 485, 488 (Tex.Crim.App.2004). In examining the record evidence in the light most favorable to the verdict, we disregard any evidence that does not support the verdict. *See Clewis v. State*, 922 S.W.2d 126, 132 n. 10 (Tex.Crim.App.1996). We consider all of the "light most favorable" evidence presented, whether properly or improperly admitted. *See Miles v. State*, 918 S.W.2d 511, 512 (Tex.Crim.App.1996). This standard leaves to the factfinder the responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *See Lacour v. State*, 8 S.W.3d 670,

**3.** Although revisions to section 32.21 took effect on September 1, 2003, they have no impact on the section for purposes of our analysis. We therefore refer to the current version to lessen confusion.

671 (Tex.Crim.App.2000). The factfinder is the sole judge of the credibility of the witnesses and the weight given their testimony. Tex.Code Crim. Proc. Ann. art. 38.04 (Vernon 1979). Thus, the factfinder is free to accept or reject any or all of a witness's testimony. *See Margraves v. State,* 34 S.W.3d 912, 919 (Tex.Crim.App. 2000). The jury in the instant appeal was presented with sufficient evidence to reasonably infer that appellant presented the "Laura Green" prescription to the Wal–Mart pharmacy with full knowledge that the prescription was not the act of Dr. Chary. We must disregard appellant's protestations to the contrary under a legal sufficiency analysis. Issue one is overruled in both causes, and the judgments in both causes are affirmed.

AFFIRMED.