

**NUMBER 13-10-00339-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**BILLIE JEAN AVERY,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

**On appeal from the 156th District Court
of Bee County, Texas.**

---

**O P I N I O N**

**Before Chief Justice Valdez and Justices Rodriguez and Perkes
Opinion by Chief Justice Valdez**

Appellant, Billie Jean Avery, was charged by indictment with obtaining an increased quantity of a Schedule II controlled substance through the use of a fraudulent prescription form, a second-degree felony.[1]  *See* TEX. HEALTH & SAFETY CODE ANN. §

---

[1] In this case, Avery allegedly tried to obtain an increased quantity of Lortab.  Lortab is the trade name for hydrocodone, a controlled substance which is listed in Schedule II of the health and safety code.

481.129(a)(5)(B), (d)(1) (Vernon 2010). After a jury trial, Avery was convicted of the underlying offense and was sentenced to twenty-five years' confinement in the Institutional Division of the Texas Department of Criminal Justice with a $1,500 fine.[2] On appeal, Avery argues that the trial court erred in denying her motion for a directed verdict because the State failed to present sufficient evidence proving the manner and means of the offense stated in the indictment. Specifically, Avery contends that there is no evidence that she used a "fraudulent prescription form" to obtain an increased dosage of a controlled substance, as alleged in the indictment. We reverse and vacate the judgment, and remand for entry of a judgment of acquittal.

## I.    BACKGROUND

On January 15, 2010, Donald Breech, M.D. treated Avery for pain associated with her knee.[3] Dr. Breech prescribed forty 2.5-milligram tablets of Lortab, a controlled substance containing hydrocodone, for Avery. Dr. Breech used his own prescription

---

See TEX. HEALTH & SAFETY CODE ANN. § 481.032 (Vernon 2010); see also Smith v. State, No. 2-07-125-CR, 2008 Tex. App. LEXIS 4779, at **4-5 (Tex. App.–Fort Worth June 26, 2008, pet. ref'd) (mem. op., not designated for publication) (noting that Lortab contains hydrocodone and that hydrocodone is listed in Schedule II); Beaty v. State, 156 S.W.3d 905, 906 n.2 (Tex. App.–Beaumont 2005, no pet.) (stating that Lortab is a Schedule II controlled substance because it contains hydrocodone); Tilson v. State, No. 05-96-00292-CR, 1998 Tex. App. LEXIS 4789, at *2 (Tex. App.–Dallas Aug. 6, 1998, no pet.) (mem. op., not designated for publication) (same); United States Dep't of Justice, Drug Enforcement Admin., Drugs and Chemicals of Concern: Hydrocodone, available at http://www.deadiversion.usdoj.gov/drugs_concern/hydrocodone/hydrocodone.htm (last visited Feb. 8, 2011); Drugs.com, Lortab, available at http://www.drugs.com/lortab.html (last visited Feb. 8, 2011) (describing Lortab as a combination of acetaminophen and hydrocodone).

[2] The indictment contained two enhancement paragraphs alleging Avery's prior felony convictions for forgery and burglary of a habitation, both of which the trial court ultimately determined were "true." Because she had been twice convicted of felonies and the offense in this case was a third-degree felony, Avery was subject to the punishment range associated with first-degree felonies—confinement for five to ninety-nine years or life. See TEX. PENAL CODE ANN. § 12.32(a) (Vernon Supp. 2010) (outlining the punishment range for first-degree felonies); see also id. § 12.42(b) (Vernon Supp. 2010) ("[I]f it is shown on the trial of a second-degree felony that the defendant has been once before convicted of a felony, on conviction he shall be punished for a first-degree felony.").

[3] Dr. Breech testified that Avery had reoccurring pain in her knee and her ankle that had previously required surgery.

form when filling out the prescription, and at trial, he noted that he prescribed Avery the lowest dose of Lortab that is manufactured because he believed that Avery was possibly abusing the drug in some manner. Dr. Breech further opined that he did not give Avery permission to alter the prescription and that when it was later presented at Wal-Mart, the prescription form constituted a "fraudulent prescription form."

Later that day, Avery, her common-law husband, Robin Bright, and Bright's mother went to a Wal-Mart in Beeville, Texas, to fill the prescription. Adela Munoz, a certified pharmacy technician working for Wal-Mart, testified that Avery presented the prescription form to her. Munoz described the incident as follows:

> What I did do, ma'am, is—everything now is computerized, so we have to actually scan our prescriptions into the system to have a visual for our records. The prescription, itself, when I scanned it in came out—this area right here came out shaded black. So right above it, I put "seven-point-five." And then the pharmacist did receive the prescription on her screen, our visual. And she asked me, you know, "What is this above here?" And I told her I did that. Because through the system, all you could see was just a black spot where it had been changed.[4]

---

[4] Stephani Trbula, M.D., the Wal-Mart pharmacist on duty, was shown the prescription form that Avery presented to the pharmacy department at the Beeville Wal-Mart and described it as follows:

> Where the original prescription was written, there was [sic] cross-out marks and then the actual strength had been written over a couple of times so that it was darker throughout the cross-out mark. And then above that, there were parentheses that said "seven-point-five." And so it had been altered and so I wasn't sure who made the alterations or what the true strength was.

She further noted that:

> [Munoz] had wrote [sic] the "seven-point-five" in parentheses above the original strength of the medication because when she scanned it into our computer, you couldn't read it. Because of the erasure marks, you couldn't see the strength on our digital screen. So she had written it in parentheses to let me know that that's what it said but that she did not make any of the cross-out marks or any of the darkening on the actual image.

3

Munoz admitted to writing the "seven-point-five" notation of the prescription form, presumably at the direction of Avery; however, Munoz denied making any "cross-out marks" or shading on the form.[5]

Once Avery left, Munoz became suspicious about the form and the "cross-out marks," so she informed Stephani Trbula, M.D., the staff pharmacist on duty that day. Dr. Trbula testified that she did a "four-point" inspection of the prescription form, which included four different things:

> the name of the patient, the name of the drug, the directions[,] and the doctor. And during my four-point evaluation, I also verify that it is a legitimate prescription. And if there are any alterations, I check to see, you know, if my technician made the alteration or if it was the doctor that made the alteration and we make phone calls at that time if there's anything that I need to clarify before I send [the prescription] on [to be filled].

Dr. Trbula noted that the prescription form was "a typical—just a plain prescription pad. This was—I believe—yeah, it does have a security guard on the back."[6] Nevertheless, when conducting her inspection, Dr. Trbula was troubled by what appeared to be alterations to the form. She first spoke to Munoz, who admitted to writing the "'seven-point-five' in parentheses" on the form. However, Dr. Trbula was troubled by the "cross-outs" on the form, so she called Dr. Breech's office. Dr. Trbula spoke to "Karen," who purportedly is a nurse in Dr. Breech's office. Karen informed Dr. Trbula that no one in Dr. Breech's office made the "cross-outs" on the prescription form and that the form was supposed to prescribe "two-point-five milligrams" of Lortab for Avery. Dr. Breech

---

[5] The "seven-point-five" notation refers to the dosage strength of the prescribed Lortab.

[6] On cross-examination, Dr. Trbula stated that if people manufactured their own prescription forms and then presented them for fulfillment, the forms would be "fraudulent prescription forms." She also acknowledged that the prescription form in this case was Dr. Breech's form and that the form, itself, was not a fraudulent prescription form. Instead, she testified that the form merely contained an unauthorized alteration.

4

confirmed these facts in his testimony. Karen concluded that the form had been altered after Avery left Dr. Breech's office; thus, Dr. Trbula was instructed to not dispense the medication and to call law enforcement.

Shortly thereafter, Bright returned to the Wal-Mart, and when he acknowledged that he was there to pick up the prescription, police handcuffed him and escorted him out to the Wal-Mart parking lot. Bright told police that Avery was waiting in the car for him, and he directed police to the car. Upon questioning by police, Avery admitted to altering the prescription form. Bright was subsequently released from police custody, and Avery was arrested.

In the indictment, the State alleged that on or about January 15, 2009, Avery "through use of a fraudulent prescription form . . . knowingly attempt[ed] to obtain a controlled substance, namely, Lortab, by increasing the dosage." *See id.* § 481.129(a)(5)(B). The language of the indictment clearly indicates that the State charged Avery with violating section 481.129(a)(5)(B) of the health and safety code, rather than section 481.129(a)(5)(A), which states that a defendant commits an offense by knowingly obtaining or attempting to obtain an increased quantity of a controlled substance "by misrepresentation, fraud, forgery, deception, or subterfuge." *See id.* § 481.129(a)(5)(A)-(B).

The case was tried to a jury on May 17-18, 2010. At the close of the State's case-in-chief, Avery moved for a directed verdict, asserting that there was no evidence that she attempted to obtain an increased quantity of a controlled substance "through use of a fraudulent prescription form," as alleged in the indictment and the jury charge. Specifically, counsel for Avery argued that: "The testimony is that the prescription form

5

is not fraudulent. It is the prescription form of the doctor. What the testimony has been is that the prescription itself, that the doctor wrote on his form was altered." The State countered that "the form is not limited to what has been pre-printed on the document"; thus, the alteration of the prescription form resulted in a "fraudulent prescription form."

In analyzing section 481.129(a)(5)(A) and (B), the trial court noted that:

> [T]he problem is the State has used a fraudulent prescription form. Plain meaning of that term would be somebody wrote "Dr. A.B.C." on there instead of "Dr. Breech." Dr. Breech has testified that's his form. Yesterday the pharmacist [Dr. Trbula] testified that's a good form; there's nothing wrong with that prescription form. The indictment says "fraudulent prescription form." Okay. So I think the legislators in their intent to note that was a separate thing—there's [sic] people out there, like, making checks. That's in my mind, "B" is like you're over there chucking the change and making your own checks. You're making your checks. Our legislators, that's why they have "A" up there. I mean, I think the evidence substantiates "A," but you didn't indict her on that.
>
> . . . .
>
> There is no definition of the word "form." Okay. There is the definition of "prescription" provided but not for the word "form." So when you don't have a legal definition, you go back to the common-law meaning of the definition of "form" which is a preprinted—preprinted, without looking at Webster's, would be a preprinted . . . piece of document or paper that you fill in blanks, and that's what we have in this case.

Despite its apparent agreement with Avery's argument in her motion for directed verdict, the trial court denied the motion without explanation. The jury subsequently convicted Avery of the charged offense, and the trial court sentenced her to twenty-five years' confinement with a $1,500 fine. This appeal followed.

## II.    STANDARD OF REVIEW

We treat a challenge to the denial of a motion for directed verdict as a challenge to the legal sufficiency of the evidence. *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996); *see also Trevino v. State*, Nos. 13-09-00511-CR & 13-09-

6

00512-CR, 2010 Tex. App. LEXIS 6751, at *3 (Tex. App.–Corpus Christi Aug. 19, 2010, no pet.) (mem. op., not designated for publication). To assess whether the evidence supporting the verdict is sufficient, we consider all the evidence in the record in the light most favorable to the jury's verdict and determine whether a rational jury could have found the defendant guilty of all the elements of the crime beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 898-99 (Tex. Crim. App. 2010) (plurality opinion) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008). The hypothetically correct jury charge in this case would have required the jury to find that: (1) on or about January 15, 2009; (2) Avery knowingly; (3) possessed, obtained, or attempted to possess or obtain; (4) an increased quantity of a controlled substance; and (5) through use of a fraudulent prescription form. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(B).

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003). Knowledge may be inferred from a person's acts, words, and conduct. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Martinez v. State*, 833 S.W.2d 188, 196 (Tex. App.–Dallas 1992, pet. ref'd).

In addition, "when the statute defines alternative methods of manner and means of committing an element and the indictment alleges only one of those methods, 'the

law' for purposes of the hypothetically correct charge, is the single method alleged in the indictment." *Gollihar v. State*, 46 S.W.3d 243, 255 (Tex. Crim. App. 2001) (citing *Curry v. State*, 30 S.W.3d 394, 405 (Tex. Crim. App. 2000)); *see Jacobs v. State*, 230 S.W.3d 225, 230 (Tex. App.–Houston [14th Dist.] 2006, no pet.) ("Because the indictment alleges only one of those methods—theft by deception—appellant could be convicted only if he committed theft by that method."). Thus, the State was required to prove that Avery procured or attempted to procure Lortab "through use of a fraudulent prescription form" and cannot rely on the alternative methods of manner and means described in section 481.129(a)(5)(A). *See* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(A).

### III. ANALYSIS

In her sole issue, Avery contends that the trial court erred in denying her motion for directed verdict because the State failed to present sufficient evidence proving the manner and means of the offense charged in the indictment. Specifically, Avery argues that the evidence does not demonstrate that she procured or attempted to procure Lortab through use of a fraudulent prescription form. She further argues that the alteration to the form presented to the pharmacy department at the Beeville Wal-Mart did not "result in a prescription form that was fraudulent." The State asserts that Avery's altering of the prescription form did, in fact, "create a fraudulent prescription form"; thus, the evidence is sufficient to sustain Avery's conviction under section 481.129(a)(5)(B) of the health and safety code.[7] *See id.* § 481.129(a)(5)(B).

### A. Applicable Law

---

[7] At the outset of our analysis, we note that the State has not cited to any relevant authority to support its position on appeal.

Our analysis of the sufficiency of the evidence supporting Avery's conviction hinges upon the proper definition of the term "fraudulent prescription form," as described in section 481.129(a)(5)(B) of the health and safety code, and how it applies. *See id.* The parties do not dispute that section 491.129 of the health and safety code does not explicitly define "fraudulent prescription form." Thus, we must resort to other resources to determine the proper definition of "fraudulent prescription form."

When interpreting statutes, we seek to effectuate the intent or purpose of the legislators who enacted them. *See Camacho v. State*, 765 S.W.2d 431, 433 (Tex. Crim. App. 1989). If the statute is clear and unambiguous, the plain meaning of the words should be applied. *Hines v. State*, 75 S.W.3d 444, 447 (Tex. Crim. App. 2002); *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991); *see* TEX. HEALTH & SAFETY CODE ANN. § 1.002 (Vernon 2010) (noting that chapter 311 of the government code applies to the construction of each provision of the health and safety code); TEX. GOV'T CODE ANN. § 311.011(a)-(b) (Vernon 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," unless the words have acquired a technical or particular meaning, in which case the words shall be construed accordingly). If an application of the plain language would lead to an absurd result the Legislature could not have intended, we may look to extra-textual factors to arrive at a sensible interpretation of the statute. *See Hines*, 75 S.W.2d at 447; *Boykin*, 818 S.W.2d at 785-86. However, we must keep in mind that "[i]t would be illogical to presume that the Legislature intended a part of the statute to be superfluous" and "the Legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from . . . a statute." *Boykin*, 818 S.W.2d at 785-86.

9

The court of criminal appeals has also stated that:

> "Every word of a statute is presumed to have been used for a purpose, and a cardinal rule of statutory construction requires that each sentence, clause, phrase[,] and word be given effect if reasonably possible. . . . This rule is not altered by the fact that the Legislature has not defined a particular word or phrase, and in the absence of such a definition[,] the words of the enactment will usually be given their ordinary meaning."

*Morter v. State*, 551 S.W.2d 715, 718 (Tex. Crim. App. 1977) (quoting *Eddins-Walcher Butane Co. v. Calvert*, 156 Tex. 587, 298 S.W.2d 93, 96 (1957)); *see Campos v. State*, 623 S.W.2d 657, 658 (Tex. Crim. App. 1981) (holding that when words in a criminal statute are not defined, the words employed are given their plain meaning).

## B. Discussion

On appeal, the State argues that section 481.075(e) of the health and safety code guides us in determining the proper contents of a "prescription form." TEX. HEALTH & SAFETY CODE ANN. § 481.075(e) (Vernon 2010). Section 481.075(e) of the controlled substances act provides, in relevant part, that:

> Each official prescription form used to prescribe a Schedule II controlled substance must contain:
>
> (1) information provided by the prescribing practitioner, including:
>
> (A) the date the prescription was written;
>
> (B) the controlled substance prescribed;
>
> (C) the quantity of controlled substance prescribed, shown numerically followed by the number written as a word;
>
> (D) the intended use of the controlled substance or the diagnosis for which it is prescribed and the instructions for use of the substance;

10

(E) the practitioner's name, address, department registration number, and the Federal Drug Enforcement Administration number;

(F) the name, address, and date of birth or age of the person for whom the controlled substance is prescribed; and

(G) if the prescription is issued to be filled at a later date under Section 481.074(d-1), the earliest date on which a pharmacy may fill the prescription;

(2) information provided by the dispensing pharmacist, including the date the prescription is filled; and

(3) the signatures of the prescribing practitioner and the dispensing pharmacist.

*Id.* We find section 481.075(e) to be applicable because the drug involved in this matter—Lortab—is a Schedule II controlled substance.[8] *See id.*

A copy of the prescription form that Avery presented was made a part of the indictment and was entered into evidence as State's exhibit 1. The prescription form included, among other things: (1) Dr. Breech's name, office address, phone number, and signature; (2) Avery's name and birth date; (3) the Federal Drug Enforcement Administration number; (4) the date the form was signed by Dr. Breech; (5) the prescribed dosage and strength of Lortab; and (6) security measures—numerous imprints of the word "VOID"—meant to prevent reproductions of the form from being presented for prescription fulfillment. Essentially, the form contains the requirements listed in section 481.075(e) and, thus, constitutes an "official prescription form." *See id.* Now, we must determine whether the changes made by Avery constituted a forgery, misrepresentation, deception, or fraud under section 481.129(a)(5)(A), as Avery argues, or whether the prescription form constituted a "fraudulent prescription form" as a result

---

[8] *See supra* note 1.

11

of Avery's alterations, as argued by the State. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(A)-(B).

In determining whether Avery's actions fall within section 481.129(a)(5)(A) or 481.129(a)(5)(B), we first examine the prior version of section 481.129(a)—former article 4476-15, section 4.09(a). *See id.*; *see also* Acts 1979, 66th Leg., R.S., ch. 90, § 6, eff. May 2, 1979 (former TEX. REV. CIV. STAT. art. 4476-15, § 4.09(a)(3)), *repealed by* Act of June 14, 1989, 71st Leg., R.S., ch. 678, § 13(1), 1989 Tex. Gen. Laws 2230, 2942; *Whitfield v. State*, 784 S.W.2d 484, 486 (Tex. App.–Texarkana 1990, no pet.). In comparing former article 4476-15, section 4.09(a) with section 481.129(a), we observe a significant change made by the Legislature. Under former article 4476-15, section 4.09(a), the Legislature bundled together manners and means involving the procurement or attempted procurement of an increased quantity of controlled substances by "misrepresentation, fraud, forgery, deception, or subterfuge" and "through use of [a] fraudulent prescription form"; however, when the Legislature enacted section 481.129(a), it separated the manner and means into two subsections—one involving "misrepresentation, fraud, forgery, deception, or subterfuge" (section 481.129(a)(5)(A)) and a second provision involving only the use of "fraudulent prescription form[s]" (section 481.129(a)(5)(B)). *See* Acts 1979, 66th Leg., R.S., ch. 90, § 6, eff. May 2, 1979 (former TEX. REV. CIV. STAT. art. 4476-15, § 4.09(a)(3) (repealed 1989); *see also* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(A)-(B). In repealing former article 4476-15, section 4.09(a) and replacing it with the provisions of section 481.129(a), the Legislature clearly intended for each provision to constitute a separate offense, rather than two sides of the same coin. *See* Acts 1979, 66th Leg., R.S., ch. 90,

§ 6, eff. May 2, 1979 (former TEX. REV. CIV. STAT. art. 4476-15, § 4.09(a)(3) (repealed 1989); *see also* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(A)-(B). Therefore, because the Legislature separated the manner and means through the enactment of section 481.129(a), we are not persuaded by the State's argument that Avery's changing of the valid prescription form created a "fraudulent prescription form." To so hold would render section 481.129(a)(5)(A) superfluous, which would be contrary to the Legislature's intent.[9] *See* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(A)-(B); *see also Boykin*, 818 S.W.2d at 785-86 (stating that we are to interpret statutes so as to not render provisions superfluous).

Based on our review of the predecessor statute to section 481.129(a) and governing case law, we believe that the Legislature intended for section 481.129(a)(5)(B) to apply to those instances where, for example, an individual has created his own prescription form, filled out the entire prescription form, and presented it to a pharmacy for fulfillment—an act that would essentially render a prescription form invalid at all relevant time periods. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(B). Section 481.129(a)(5)(A) appears to apply to instances, such as in this case, where an individual makes a modification to an otherwise valid prescription form. Though the terms "misrepresentation," "fraud," "forgery," and "deception" are not

---

[9] Section 481.129(a)(5)(A) would be superfluous if we agreed with the State's argument because all prescriptions require the presentment of a prescription form or order and, according to the State's reasoning, any attempts to alter, change, or re-create a prescription form would make the form a "fraudulent prescription form," rendering the acts criminalized in section 481.129(a)(5)(A) meaningless or included in the "fraudulent prescription form" offense. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.002(41) (defining a "prescription" as "an order by a practitioner to a pharmacist for a controlled substance for a particular patient," which includes several identifying pieces of information), 481.075, 481.129(a)(5)(A)-(B) (Vernon 2010). We do not believe that such a construction reflects the intent of the Legislature, especially considering former article 4476-15, section 4.09 previously grouped all of the manner and means together and section 481.129(a) separated the acts into unique divisions that each are separate and distinct.

13

defined in the health and safety code, we believe that Avery's actions in this case coincide more with section 481.129(a)(5)(A).  *See id.* § 481.129(a)(5)(A).

As noted earlier, if terms are not clearly defined in the code, we are to apply the plain and common meaning of the words so long as the interpretation does not lead to an absurd result that the Legislature could not have intended.  *See Hines*, 75 S.W.2d at 447; *Boykin*, 818 S.W.2d at 785-86.  "[F]raud" is defined as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment."  BLACK'S LAW DICTIONARY 731 (9th ed. 2009); *see* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 464 (10th ed. 1996) (defining "fraud" as "an act of deceiving or misrepresenting . . . .").  On the other hand, "misrepresentation" is defined as "[t]he act of making a false or misleading assertion about something . . . with the intent to deceive."  BLACK'S LAW DICTIONARY at 1091; *see* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY at 744 (defining "misrepresentation as giving "a false or misleading representation . . . with an intent to deceive or be unfair . . . .").  Further, the common definition of "forgery" is "[t]he act of fraudulently making a false document or altering a real one to be used as if genuine . . . ."  BLACK'S LAW DICTIONARY at 722; *see* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY at 457 (defining "forgery" as "the crime of falsely and fraudulently making or altering a document").  And, finally, "deceit" is defined as "[t]he act of intentionally giving a false impression."  BLACK'S LAW DICTIONARY at 465; *see* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY at 298 (defining "deceive" as giving "a false impression").  The change Avery made on the prescription form most resembles a "forgery."  *See* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(A); *see also* BLACK'S LAW DICTIONARY at 722; MERRIAM WEBSTER'S COLLEGIATE DICTIONARY at 457.

14

The testimony adduced at trial was that the prescription form was valid when Avery left Dr. Breech's office and that Avery made the changes in an attempt to pass off the altered document as the act of Dr. Breech for the purpose of acquiring an increased dosage of Lortab. *See* BLACK'S LAW DICTIONARY at 722; *see also* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY at 457. Based on her actions, the State should have charged Avery with violating section 481.129(a)(5)(A). *See* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(A). However, it chose not do so.

Moreover, the State does not cite any case law to support its contention that the prescription form at issue in this case amounted to a "fraudulent prescription form." Based on our review, we have only found a handful of cases involving a purported "fraudulent prescription form," and each appears to support this Court's interpretation of section 481.129(a)(5)(A) and (B). *See Beaty v. State*, 156 S.W.3d 905, 906-07 (Tex. App.–Beaumont 2005, no pet.); *Whitfield v. State*, 784 S.W.2d 484, 485-87 (Tex. App.– Texarkana 1990, no pet.); *see also Greer v. State*, No. 2-09-087-CR, 2010 Tex. App. LEXIS 5632, at **1-7 (Tex. App.–Fort Worth July 15, 2010, pet. ref'd) (mem. op., not designated for publication); *Kirby v. State*, No. 05-08-00217-CR, 2009 Tex. App. LEXIS 3990, at **2-9 (Tex. App.–Dallas May 29, 2009, no pet.) (not designated for publication); *Travis v. State*, Nos. 11-07-00204-CR, 11-07-00205-CR, 11-07-00206-CR, 2008 Tex. App. LEXIS 5947, at **10-13 (Tex. App.–Eastland Aug. 7, 2008, pet. ref'd) (mem. op., not designated for publication). In most of the cases, the defendant was charged with both (1) forging, misrepresenting or engaging in fraud, *see* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(A), and (2) utilizing a "fraudulent prescription form" to obtain an increased amount of a controlled substance. *See id.* § 481.129(a)(5)(B); *Beaty*, 156

15

S.W.3d at 906; *Whitfield*, 784 S.W.2d at 486; *see also Travis*, 2008 Tex. App. LEXIS 5947, at *1. Unlike the instant case, the State in *Beaty*, *Whitfield*, and *Travis* did not constrain itself to one manner or means of committing the charged offense, which allowed for the convictions to be sustained under either section 481.129(a)(5)(A) or section 481.129(a)(5)(B). *See Beaty*, 156 S.W.3d at 906; *Whitfield*, 784 S.W.2d at 486; *see also Travis*, 2008 Tex. App. LEXIS 5947, at *1.

Of the above-mentioned cases, only two involved instances in which the defendants were charged solely under section 481.129(a)(5)(B). *See Greer*, 2010 Tex. App. LEXIS 5632, at **1-7; *Kirby*, 2009 Tex. App. LEXIS 3990, at **2-9. As such, these cases warrant additional discussion. Moreover, the fact patterns in *Beaty* and *Whitfield* cases are also instructive in our analysis of Avery's issue.

### 1. The *Greer* case

In *Greer*, the defendant was charged with "knowingly possessing or attempting to possess or obtain a controlled substance through the use of a fraudulent prescription." 2010 Tex. App. LEXIS 5632, at *2. In affirming the defendant's conviction, the Fort Worth Court of Appeals noted that the evidence showed that the defendant presented a fraudulent prescription for 120 pills of Lortab at a Denton County Walgreen's. *Id.* at *4. The Court noted that the prescription was fraudulent because it was for an unknown "Jason Martin"; "it was for six times the normal prescription amount"; and "it was created to look like a prescription form from the doctor who purportedly wrote it." *Id.* at *4. Essentially, the Court concluded that the prescription form was fraudulent because the defendant had re-created a prescription form to look like another written by a licensed doctor. *See id.* at *4.

16

In the instant case, Avery did not re-create a prescription form or change the name on the prescription to refer to a fictitious person; instead, she made a change to the dosage strength of a valid prescription form that was created by Dr. Breech. The record in this case demonstrates that had Avery not changed the dosage strength, the prescription would have been filled given that all aspects of the prescription form were valid.

## 2. The *Kirby* case

In *Kirby*, the defendant was charged with "intentionally and knowingly obtain[ing] or attempt[ing] to obtain a controlled substance . . . by fraud through use of a fraudulent prescription form." 2009 Tex. App. LEXIS 3990, at *2. The facts revealed that the defendant presented a pharmacy technician with a prescription form for "eight ounces of Promethazine with codeine and twenty Veetid antibiotic tablets." *Id.* The pharmacy technician was suspicious of the form and showed it to the on-duty pharmacist. The on-duty pharmacist was also suspicious because: (1) the prescription form "had a different background and color than most other prescriptions, and looked like a photocopy"; (2) "the antibiotic Veetid had not been manufactured under that name for six years because the company had gone out of business"; (3) the pharmacist had received valid prescriptions from the prescribing doctor "but those 'scripts' were on white paper with a different font size and style"; and (4) "a fraudulent prescription had been presented to him about ten days earlier that was on the same paper and was represented to be from the same doctor." *Id.* at **3-4. The pharmacist did not fill the prescription and contacted the prescribing doctor's office manager about the form. *Id.* at **4-5. The prescribing doctor's office manager told the pharmacist that the form was fraudulent because it was

not in the doctor's handwriting and it did not contain the doctor's signature. *Id.* at \*5. She further testified that the doctor had stopped using the particular prescription form that was tendered; that the defendant had never been one of the doctor's patients; and that the doctor had never written a prescription for the defendant. *Id.*

Though Kirby's appellate argument centered on whether the evidence was factually sufficient to establish that he was the individual who presented the purported "fraudulent prescription form" to the pharmacy, the Dallas Court of Appeals concluded that the evidence supporting the defendant's conviction for obtaining or attempting to obtain a controlled substance by fraud through use of a fraudulent prescription form was sufficient. *Id.* at \*\*8-9. Implicit in this ruling is that a form becomes a "fraudulent prescription form" when an individual re-creates an entire prescription form and attempts to use the newly-created prescription form to obtain a controlled substance. This is so because the State only charged Kirby with a section 481.129(a)(5)(B) offense; the jury convicted; and the Dallas Court of Appeals affirmed when it could have reversed the conviction by concluding that Kirby engaged in the fraudulent activities prescribed in section 481.129(a)(5)(A). *See* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(A).

In this case, Avery merely changed one term of an otherwise valid prescription form. Dr. Breech testified at trial that he prescribed Lortab for Avery, albeit the lowest dosage possible, whereas the doctor in *Kirby* had never treated the defendant nor written a prescription for him. *Kirby*, 2009 Tex. App. LEXIS 3990, at \*5. In addition, both Dr. Breech and Dr. Trbula testified that the form tendered was an ordinary prescription form and was valid, though it contained a change in the dosage strength.

Avery's prescription form was signed by Dr. Breech and contained the necessary information outlined in section 481.075(e).  *See* TEX. HEALTH & SAFETY CODE ANN. § 481.075(e).  One can hardly say that the prescription form tendered by Avery resembles the clearly fraudulent prescription form at issue in *Kirby*.  *See Kirby*, 2009 Tex. App. LEXIS 3990, at **3-4.

### 3.  The *Beaty* case

The defendant in *Beaty* was charged under two separate indictments for having obtained controlled substances, Lortab and Xanex, by forgery, under section 481.129(a)(5)(A) and (B) of the health and safety code.  156 S.W.3d at 906.  The defendant brought a written prescription to a Wal-Mart pharmacy located in Livingston, Texas.  *Id.* at 906-07.  The prescription form indicated that Achi Chary, M.D. had issued it on January 22, 2003, to "Laura Green" for Lortab and Xanex.  *Id.* at 907.  At trial, Dr. Chary testified that he had never treated a "Laura Green" and that he had never written a prescription for "Laura Green."  *Id.*  Dr. Chary further testified "that a blank prescription pad was stolen from his office" and that "anyone could have forged the 'Laura Green' prescription."  *Id.*  Dr. Chary recalled treating and prescribing similar medications for the defendant about a week before this prescription form was presented.  *Id.*

On appeal, the defendant argued that the evidence was insufficient to establish that she "knew that the prescription form used to obtain the controlled substance was forged."  *Id.* at 906.  In concluding that the evidence supporting the defendant's conviction was sufficient, the Beaumont Court of Appeals held that the jury could reasonably infer that the defendant "presented the 'Laura Green' prescription to the

Wal-Mart pharmacy with full knowledge that the prescription was not the act of Dr. Chary." *Id.* at 910.

Unlike the instant case, the jury in *Beaty* inferred that the defendant stole a prescription pad from Dr. Chary's office and then filled out a prescription for similar medications that were received about a week earlier, while using the alias "Laura Green." *See id.* at 907. In fact, the *Beaty* defendant filled out the entire prescription form that was presented at the Wal-Mart pharmacy in Livingston. *Id.* at 906-07. In this case, Dr. Breech filled out the entire prescription form, and when Avery left Dr. Breech's office, she had a valid prescription form. However, before she presented it to the Wal-Mart pharmacy in Beeville, she made a single change to the dosage strength. Clearly, the prescription form in this case does not involve the use of a stolen prescription pad, and Avery did not fill out the entire prescription form herself. Like *Greer* and *Kirby*, the *Beaty* court appears to conclude that the use of a "fraudulent prescription form" involves a form that defendants create or fill out entirely by themselves to facilitate the procurement of a controlled substance.[10] *See id.* at 910; *see also Greer*, 2010 Tex. App. LEXIS 5632, at *4; *Kirby*, 2009 Tex. App. LEXIS 3990, at **3-4.

### 4. The *Whitfield* case

---

[10] The dissent suggests that the *Beaty* court affirmed Beaty's conviction under section 481.129(a)(5)(B)—the fraudulent prescription form provision. However, we note that Beaty was charged by indictment with both forging a prescription and using a fraudulent prescription form under sections 481.129(a)(5)(A) and 481.129(a)(5)(B). *See Beaty v. State*, 156 S.W.3d 905, 906 (Tex. App.–Beaumont 2005, no pet.). On appeal, Beaty only challenged the sufficiency of the evidence indicating that she presented the prescription form to the Wal-Mart pharmacy with full knowledge that the prescription was not the act of the doctor, or in other words, she merely challenged the intent prong of the offense—a culpable mental state that is common to both offenses. *Id.*; *see* TEX. HEALTH & SAFETY CODE ANN. § 481.129(a)(5)(A), (a)(5)(B). She did not argue that the State charged her under the wrong statute. In affirming Beaty's conviction, the Beaumont Court of Appeals simply concluded that Beaty acted with full knowledge that the prescription form presented to the pharmacy was not the act of the doctor. *Beaty*, 156 S.W.3d at 910. The *Beaty* court did not definitively state that it was affirming Beaty's conviction under either section 481.129(a)(5)(A) or section 481.129(a)(5)(B). To that end, we do not believe that the *Beaty* case supports the dissent's position.

The Texarkana Court of Appeals' decision in *Whitfield* is important in that it involves a conviction for obtaining a controlled substance by forgery under the predecessor statute to section 481.129 of the health and safety code—former article 4476-15, section 4.09(a)(3) of the Texas Revised Civil Statutes. 784 S.W.2d at 486. Under former article 4476-15, section 4.09(a)(3), it was unlawful for any person to knowingly or intentionally "acquire, obtain, or attempt to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge, or through use of fraudulent prescription form or fraudulent oral or telephonically communicated prescription." *Id.* (citing Acts 1979, 66th Leg., R.S., ch. 90, § 6, eff. May 2, 1979 (former TEX. REV. CIV. STAT. art. 4476-15, § 4.09(a)(3) (repealed 1989))). Testimony at trial revealed that Whitfield forged an entire prescription and gave another individual $50 to go to the drug store and get the prescription filled. *Id.* at 487. Specifically, the *Whitfield* court noted that the car that Whitfield was driving "had other prescription pads from Dr. Haley's office." *Id.* Ultimately, the Texarkana Court of Appeals concluded that the evidence was sufficient to sustain Whitfield's conviction. We do not find the *Whitfield* case to be controlling in this matter because the Texarkana Court of Appeals affirmed Whitfield's conviction under former article 4476-15, § 4.09(a)(3), which, as noted earlier, combined the manner and means described in current sections 481.129(a) and 481.129(b). It is not clear whether the prescription forms used by Whitfield were valid or invalid at the time of their creation; thus he could have been convicted for either forging the prescription form or for using a fraudulent prescription form.

**5. Summary**

21

A review of the *Greer*, *Kirby*, *Beaty*, and *Whitfield* cases reveals that for an individual to be convicted for using a fraudulent prescription form to procure an increased quantity of a controlled substance, the individual must engage in acts very different from the acts in this case—i.e., re-creating prescription forms. *See Beaty*, 156 S.W.3d at 906-07; *Whitfield*, 784 S.W.2d at 486; *see also Greer*, 2010 Tex. App. LEXIS 5632, at *4; *Kirby*, 2009 Tex. App. LEXIS 3990, at **3-4. Here, because the State chose to include a specific manner and means of committing the offense, the State was obligated to prove "the single method alleged in the indictment." *Gollihar*, 46 S.W.3d at 255; *see Curry*, 30 S.W.3d at 405; *Jacobs*, 230 S.W.3d at 230. Viewing the evidence in the light most favorable to the prosecution, we cannot say that a rational jury could have found Avery guilty of a section 481.129(a)(5)(B) offense beyond a reasonable doubt. *See Brooks*, 323 S.W.3d at 898-99; *see also Jackson*, 443 U.S. at 319. As such, we conclude that the evidence supporting Avery's conviction is insufficient and that the trial court erred in denying Avery's motion for directed verdict. *See Williams*, 937 S.W.2d at 482; *see also Trevino*, 2010 Tex. App. LEXIS 6751, at *3. We sustain her sole issue on appeal.

## IV. CONCLUSION

Having concluded that the evidence is not sufficient to support Avery's conviction for a section 481.129(a)(5)(B) offense, we reverse the case on that basis, vacate the trial court's judgment of conviction, and remand the case to the trial court for the entry of a judgment of acquittal. *See Brooks*, 323 S.W.3d at 904 (citing *Tibbs v. Florida*, 457 U.S. 31, 41 (1982) (noting that a reversal based on the "insufficiency of the evidence" has the same effect as a jury acquittal "because it means that no rational fact[-]finder

could have voted to convict the defendant" and that "the prosecution has failed to produce sufficient evidence to prove its case")).

_____
ROGELIO VALDEZ
Chief Justice

Dissenting Opinion by Justice Perkes.

Publish.
Tᴇx. R. Aᴘᴘ. P. 47.2(b)
Delivered and filed the
31st day of March, 2011.