# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00350-CR

---

**Jose Hector Ramos, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 274TH DISTRICT COURT OF HAYS COUNTY**
**NO. CR-22-4926-C, THE HONORABLE GARY L. STEEL, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Jose Hector Ramos, Jr. guilty of aggravated assault with a deadly weapon and unlawful possession of a firearm by a felon. *See* Tex. Penal Code §§ 22.02(a)(2), 46.04(a). The trial court sentenced Ramos—enhanced to habitual-offender status—to forty years' confinement for each offense and ordered that the sentences were to run concurrently. *See id.* § 12.42(d). Ramos contends that the evidence was insufficient to support the jury's guilty findings and that the trial court erred by commenting on the weight of the evidence in its guilt-innocence jury charge. We affirm the trial court's judgments of conviction.

## BACKGROUND

The charged offenses arose as part of a dispute between two neighbors, Ashley Abernathy and Jorge Arreaga. The State's witnesses at trial included Abernathy;

members of the San Marcos Police Department (SMPD); and Efrain Guevara, Arreaga's brother. Officers' body-cam videos and a recording of Abernathy's 911 call were admitted into evidence.

Abernathy testified about the assault and his identification of Ramos as the assailant. On the afternoon of September 25, 2020, Abernathy was unpacking landscaping tools from the back of his van in the driveway of his San Marcos, Texas, home. Arreaga was hosting a party of around ten-to-fifteen people in his front yard, and Arreaga and Ramos, appearing intoxicated but "nice," approached Abernathy—who, however, quickly realized that Ramos was insulting him.[1] Ramos told Abernathy that he "needed to behave and not make any complaints" about the party and accused him of having stolen a bike and broken "some pipes." The two men "got all up in [Abernathy's] face"; he stepped back, but Ramos continued to approach and reached for a handgun tucked in the side of his waistband. When Abernathy realized that Ramos had a gun, he tried to deescalate the situation.

Ramos pushed Abernathy into the back of the van and "jammed the gun against" his temple, telling him to "shut up" and take off his sunglasses. Ramos also told him that he was "a gang member in Houston" and "would come back and kill" Abernathy "should he have to stop what he was doing and come back." The altercation lasted around three-to-four minutes and ended only once Abernathy "submitted." When he at first resisted or attempted to speak, Ramos struck him repeatedly in the temple with the gun. Eventually, Ramos and Arreaga "just calmly

---

[1] Abernathy made conflicting assertions as to whether Ramos spoke English. On the 911 call, Abernathy stated that Ramos had translated for Arreaga; Abernathy likewise testified during cross-examination that Ramos "did speak English." Elsewhere, however, Abernathy testified that Arreaga had been the translator and that Ramos "doesn't speak English." Abernathy also testified that he had likely confused the two men at times on the day of the assault because of the stressful situation.

walked over to [Ramos's] truck" and watched Abernathy go inside his home. After the two men returned to the party, Abernathy called 911.

On the recording of the 911 call, which was played for the jury, Abernathy reported that "[a] guy just walked up . . . and stuck a gun to my head and threatened to kill me." The assailant, who had been accompanied by Abernathy's neighbor, was Hispanic and wearing blue-jean shorts and a white shirt. He was around 5'9", weighed approximately 200 pounds, and was between thirty-five and forty-five. The gun was chrome and "about a 9mm, .45." After the assault, the assailant had gone to a white Dodge truck parked next door. At trial, Abernathy testified that he had told officers that Ramos put the gun in the white truck because he was "moving around and doing something in the truck," and Abernathy "just assumed he put it back in the truck."

Abernathy testified that Ramos's many tattoos, including a teardrop tattoo on his face, stood out to him and that Ramos had "a longer beard" and "a lot more facial hair" than he did at the time of trial. Abernathy described the gun to police as a silver or chrome "ornate" pistol with a pearl or ivory grip.

Asked on cross-examination why he had not mentioned Ramos's tattoos to police and why he had described Ramos as having "very little facial hair, if any at all," Abernathy testified that he had been "more concerned about the gun," that he did not remember giving that description of Ramos's facial hair, and that he had been "stressed out" and was likely describing Arreaga. Asked why he had mischaracterized Ramos's clothing and had suggested to officers that Ramos had changed clothes, Abernathy testified that he could recall only Ramos's mustache, tattoo, and gun and had not paid "any attention to what he was really wearing at the time."

3

Abernathy clarified that he had immediately picked out Ramos when shown a video of the partygoers by police. He testified, "[T]here's no doubt in my mind that that was the gentleman. The one that they arrested was the one holding the gun." He also testified that he had no doubt that Ramos had put the gun to his head.

SMPD Officers Gavin Gonzales, Daniel George, Todd Poirier, and Jeffrey Smith testified about the actions law enforcement took after arriving at the scene. Officers determined that Ramos "was associated with [the] white Dodge vehicle" to which Abernathy reported the assailant had gone following the assault. Ramos—identified by multiple officers as English-speaking—told police that the truck was registered to his wife, and keys to the truck were found in his pocket.[2] Officers searched the truck with his permission but did not recover a firearm.

A handgun matching the description of the assailant's gun given by Abernathy was, however, found in the bed of a red pickup truck, which was parked in Arreaga's yard and in which Ramos was sitting when police arrived. Officer Gonzales, who found the gun, testified that it was "plainly there" and had been propped against a case of beer between the case and the wall of the truck's bed. The gun's magazine was loaded, and there was a round in the chamber. Officer Gonzales testified that he found the gun "directly to the left of where [Ramos] was first seated when [Officer Gonzales] arrived." Christina Gorzell, an SMPD evidence technician, testified that an officer had successfully test-fired the gun.

Officer Smith, who was the first officer to respond and whose body-cam video was admitted into evidence, testified that when he asked the partygoers "if anybody had pointed

---

[2] Ramos was appointed an interpreter during the guilt-innocence phase of trial but declined translation during the punishment hearing, stating that he understood. The interpreter informed the trial court that Ramos "understood everything" and "really wasn't relying on me."

a gun at anyone," Ramos "kind of pointed off to his right towards that drive that goes into the neighborhood . . . [d]own the alleyway." Asked whether the white Dodge truck belonged to him, Ramos at first "indicated it was another individual's truck." At one point, Ramos turned away from Officer Smith toward the red truck's bed and reached "[k]ind of behind him and to his right." It looked like there was something in Ramos's hand, and the direction in which he reached was "about the location" where the gun was located. Officer Smith testified that when he showed Abernathy a video of the partygoers recorded on his cellphone, Abernathy identified Ramos as the assailant and "seemed pretty sure."

Guevara testified that he and Arreaga lived next door to Abernathy with their mother and another brother, Felipe. That afternoon, the brothers and a few other men had come from playing soccer and were "just sitting there" in the yard. Guevara testified that the red truck on which Ramos had been sitting belonged to Felipe. He also testified that around a week before the alleged assault, someone had stolen the brothers' bike and broken some of their pipes; they did not know who. They had not had any disputes with Abernathy but "just wanted to know . . . if there were any problems so that [they] could fix things up." Guevara testified that before police arrived, Ramos and Arreaga had gone toward Abernathy's house but that Guevara did not "see what actually happened there." Ramos and Arreaga were gone for around five minutes.

Neither side objected to the trial court's guilt-innocence jury charge. While the judge was reading the charge to the jury, the following exchange occurred:

> THE COURT: To prove that the defendant is guilty of Unlawful Possession of a Firearm by a Felon, the State must prove beyond a reasonable doubt six elements.
>
> The elements are that: 1, the person named in the indictment; 2, on or about a certain date; 3, in Hays County, Texas; 4, intentionally, knowingly or recklessly possesses a firearm.

That's not true, is it? "Recklessly" is not in that.

THE STATE: May we approach, Judge?

THE COURT: Please.

*(At the Bench, on the record.)*

. . . .

THE STATE: There's no specified mens rea in there. It's charged with intentionally, knowingly or recklessly in the indictment as well.

THE COURT: Except through all of our Count II we just say knowingly and intelligently.

How do you recklessly possess?

THE STATE: It's frankly not relevant, I don't think, in this case.

THE COURT: I don't think it's relevant, either. I'm going to take it out.

If you have an objection, make it now.

DEFENSE COUNSEL: That's in the statute.

THE STATE: The statute doesn't specify a mens rea. So with all respect to the default—

THE COURT: Care—you just talked about care, custody and control. I don't think you can recklessly care, custody and control. I'm going to take it out because it's not in the definition above.

THE STATE: Okay.

DEFENSE COUNSEL: Okay.

*(End of Bench discussion.)*

THE COURT: We spent hours on this. And then when you read it aloud, you catch certain things.

I'm going to change No. 4 to read, "Intentionally or knowingly possess a firearm." I am striking "or Recklessly." I'm placing my initials thereon.

6

The jury found Ramos guilty of aggravated assault with a deadly weapon and unlawful possession of a firearm by a felon. The trial court sentenced him to forty years' confinement for each offense, and this appeal followed.

**DISCUSSION**

### I. Sufficiency of the Evidence

In his first issue, Ramos contends that the evidence at trial was insufficient to support the jury's findings that he was guilty of the charged offenses. Regarding the charge of aggravated assault with a deadly weapon, he argues that the State failed to prove that he used or exhibited a deadly weapon during the commission of the offense. Concerning unlawful possession of a firearm, he argues that there was no evidence that he "was in exclusive control of the place where the firearm was found," that there were no affirmative links connecting him to the recovered handgun, and that there was insufficient evidence that "the object Abernathy saw in [Ramos's] hands was a real firearm." For both offenses, he argues that the evidence was insufficient "because the weapon in evidence was never identified as the firearm used against" Abernathy. We understand this latter argument to be subsumed by his arguments respecting his possession and use or exhibition of a firearm.

When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the judgment and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). In making this determination, we "consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann*, 602 S.W.3d at 577. The factfinder "is the sole judge of

7

credibility and weight to be attached to the testimony of the witnesses." *Id.* Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018). The factfinder "can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *Stahmann*, 602 S.W.3d at 577, and "may rely on common sense and apply observation and experience gained in ordinary affairs when drawing inferences from the evidence," *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). "When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution." *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018).

We must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We must also bear in mind that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hammack v. State*, 622 S.W.3d 910, 914–15 (Tex. Crim. App. 2021). "On appeal, the same standard of review is used for both circumstantial and direct evidence cases." *Id.*

"The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) (quoting *Murray*, 457 S.W.3d at 448–49). Evidence may be legally insufficient "when the record contains either no evidence of an essential

8

element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt." *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 320). We "cannot act as a thirteenth juror" and make our own assessment of the evidence; rather, our "role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018).

As charged in this case, a person commits aggravated assault with a deadly weapon when he (1) intentionally or knowingly (2) threatens another with imminent bodily injury and (3) uses or exhibits a deadly weapon during the commission of the assault. *See* Tex. Penal Code §§ 22.01(a)(2), .02(a)(2); *Philmon v. State*, 609 S.W.3d 532, 536 (Tex. Crim. App. 2020). "A firearm is a deadly weapon *per se*." *Ex parte Huskins*, 176 S.W.3d 818, 820 (Tex. Crim. App. 2005); *see* Tex. Penal Code § 1.07(a)(17)(A). "Use" means that "the deadly weapon was employed or utilized in order to achieve its purpose," the commission of the assault. *See Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989). "Exhibit," on the other hand, "means that the weapon was consciously shown or displayed during the commission of the offense." *Id.*

To prove unlawful possession of a firearm by a felon, the State was required to prove that Ramos (1) possessed a firearm (2) after conviction and before the fifth anniversary of his release from confinement following conviction of a felony or his release from supervision under community supervision, parole, or mandatory supervision, whichever date is later. *See* Tex. Penal Code § 46.04(a)(1); *Hutchings v. State*, 333 S.W.3d 917, 920 (Tex. App.—Texarkana 2011, pet. ref'd). Ramos stipulated to a prior conviction that occurred less than five years before the assault but denied that he had possessed a firearm. "'Possession' means actual care, custody,

9

control, or management," Tex. Penal Code § 1.07(a)(39), and possession "is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control," *id.* § 6.01(b). Thus, the State was required to prove that Ramos "exercised actual care, control, or custody of the firearm"; "was conscious of his connection with the firearm"; and "possessed the firearm knowingly or intentionally." *See Smith v. State*, 176 S.W.3d 907, 916 (Tex. App.—Dallas 2005, pet. ref'd). The evidence proving possession may be direct or circumstantial, but the accused's connection with the firearm must be more than merely fortuitous. *Davis v. State*, 93 S.W.3d 664, 667 (Tex. App.—Texarkana 2002, pet. ref'd)

There was ample evidence from which a rational juror could have concluded that Ramos not only possessed but used a firearm in his assault of Abernathy. Ramos discounts the significance of Abernathy's testimony that Ramos jammed a gun against his temple, threatened to kill him, and poked or struck him with the gun repeatedly; a victim's testimony alone can be sufficient to support a deadly-weapon finding. *See Gomez v. State*, 685 S.W.2d 333, 336 (Tex. Crim. App. 1985) ("Testimony regarding the use of a revolver is sufficient to support a finding of use and exhibition of a deadly weapon."); *see also Wright v. State*, 591 S.W.2d 458, 459 (Tex. Crim. App. 1979) (concluding that victim's testimony that defendant drew a "gun," "pistol," or "revolver" and demanded money was "sufficient to authorize the jury to find that a deadly weapon was used"); *Riddick v. State*, 624 S.W.2d 709, 711 (Tex. App.—Houston [14th Dist.] 1981, no pet.) (holding that where witness has positively identified weapon as pistol, nothing more is required to support conviction of use of "a deadly weapon, to wit, a firearm").

Ramos's assertion that the State "bears the burden of producing evidence that verifies the gun was not a prop or a fake" is incorrect. To the contrary, the Court of Criminal

10

Appeals has rejected the argument that when a victim testifies that a defendant displayed a pistol but no pistol was recovered, "expert corroboration" is required to prove that what the victim described "as a pistol is in fact a pistol." *Porter v. State*, 601 S.W.2d 721, 723 (Tex. Crim. App. 1980) (where defense counsel argued that robbery "was done with some sort of a replica or fake gun"); *see Leadon v. State*, 332 S.W.3d 600, 610 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("There was testimony that described the weapon as a 'gun' and a 'revolver,' and there was no evidence indicating that it could have been fake or a toy. Thus, the testimony is sufficient to satisfy the element that a deadly weapon was used."). As in *Leadon*, there was no evidence in this case that the gun Ramos brandished was fake or a prop. Indeed, a test-fired cartridge from the recovered handgun—which matched Abernathy's distinct description of the gun wielded by Ramos—was admitted into evidence at trial.

Moreover, a rational juror could have reasonably inferred from their similar descriptions and Officer Smith's testimony that Ramos appeared to hide an object in the red truck's bed that the gun recovered from the bed was the same used in Ramos's assault of Abernathy. Abernathy testified that the gun used by Ramos during the assault was silver or chrome, looked ornate, and had a pearl or "light-colored ivory" grip. He guessed that it used 9mm rounds. Officer Gonzales testified that the gun he found in the bed matched Abernathy's description and was "silver" and "chrome-colored." Gorzell, the evidence technician, testified that the recovered gun was a "Smith & Wesson nine[-]millimeter handgun," which was "silver with a black and white handle"; the "outside of the handle" was "white" or had "a pearl cover"; and the handle's back was black.

Although Ramos points to Abernathy's conflicting statements about the assailant's description and whether he spoke English, we presume that the jury found Abernathy

11

to be credible and resolved any contradictions or conflicts in his testimony in favor of its guilty verdicts. *See Arroyo*, 559 S.W.3d at 487; *Zuniga*, 551 S.W.3d at 733. As the Court of Criminal Appeals explained in *Porter*, "The complainant testified that appellant displayed a pistol. Appellant attempted to discredit this testimony, but it was for the jury as finder of fact to weigh its credibility." 601 S.W.2d at 723.

Finally, while Ramos analyzes possession in the context of whether sufficient "affirmative links" tied him to the gun recovered from the red truck's bed, we need not conduct such an analysis in this case. The affirmative-links doctrine provides that when contraband is not in the exclusive possession of the defendant, a factfinder may still infer that the defendant possessed the contraband if sufficient independent facts and circumstances (i.e., "links") exist to justify the inference. *Tate v. State*, 500 S.W.3d 410, 413–14 (Tex. Crim. App. 2016). The doctrine is predicated on the premise that mere presence at a location where contraband is found—when the location is not in the exclusive control of the defendant—is insufficient by itself to prove possession. *Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006). The doctrine "is not a distinct rule of legal sufficiency" but only "a helpful guide to applying the *Jackson* legal-sufficiency standard of review in the context of circumstantial evidence cases." *Tate*, 500 S.W.3d at 414. Ultimately, "the inquiry remains that set forth in *Jackson*: Based on the combined and cumulative force of the evidence and any reasonable inferences therefrom, was a jury rationally justified in finding guilt beyond a reasonable doubt?" *Id.* (citing *Jackson*, 443 U.S. at 318–19).

Here, there was direct evidence—namely, Abernathy's testimony—that Ramos possessed a firearm and used it during the assault. *See Parks v. State*, 746 S.W.2d 738, 740 (Tex. Crim. App. 1987) (recognizing that eyewitness testimony is direct evidence). Because the

12

firearm was in Ramos's exclusive control at the time of the assault, the affirmative-links doctrine is inapplicable, and we need not rely on it to determine whether a rational juror could have found beyond a reasonable doubt that Ramos possessed the firearm. *See Foster v. State*, 635 S.W.2d 710, 719 (Tex. Crim. App. 1982) (stating that affirmative-links doctrine applies in absence of "direct evidence of the defendant's exclusive possession" of contraband); *Deere v. State*, 631 S.W.3d 762, 769 (Tex. App.—Eastland 2021, pet. ref'd) (concluding that doctrine did not apply because drugs were found in defendant's purse, which was in defendant's "exclusive control," and defendant "was in her own car with no one else in the vehicle"). Although, as discussed above, a rational juror could reasonably have found that the gun used in the assault was the same one recovered from the red truck, the question of whether Ramos possessed the gun while it was in the truck is a red herring; because Abernathy testified that Ramos exclusively possessed and used a gun during the assault, a rational juror could have found that the elements of both charged offenses were proven beyond a reasonable doubt. *See Gomez*, 685 S.W.2d at 336; *Wright*, 591 S.W.2d at 459; *Riddick*, 624 S.W.2d at 711.

From this record, we conclude that the evidence was sufficient to support the jury's guilty findings. We overrule Ramos's first issue.

## II. Comment on the Weight of the Evidence

In his second issue, Ramos contends that the trial court improperly commented on the weight of the evidence "when it sua sponte removed . . . the mental state of recklessness from the agreed[-]upon jury charge."[3] He argues that "an astute juror" would interpret the trial judge's emendation of the charge as "indicating that 1) evidence of recklessness is not present in

---

[3] Ramos does not challenge on appeal the correctness of the instruction's removal.

13

the case and 2) that the judge did find valid evidence of intent and knowing action within the evidence presented."

As well as requiring a trial court to instruct the jury on the law applicable to the case, article 36.14 of the Texas Code of Criminal Procedure provides that the court shall deliver to the jury a written charge "not expressing any opinion as to the weight of the evidence." Tex. Code Crim. Proc. art. 36.14. The primary reason for the rule is that an instruction "by the trial judge to the jury on the weight of the evidence reduces the State's burden of proving guilt beyond a reasonable doubt to the jury's satisfaction." *Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003) (quoting 43 Dix & Dawson, *Texas Practice: Criminal Practice and Procedure* § 36.36 (2d ed. 2001)). It is "axiomatic" that a trial court may not single out certain evidence and comment on it, *Russell v. State*, 749 S.W.2d 77, 78 (Tex. Crim. App. 1988), and that a charge that "assumes the truth of a controverted issue is a comment on the weight of the evidence and is erroneous," *Whaley v. State*, 717 S.W.2d 26, 32 (Tex. Crim. App. 1986); *see Russell*, 749 S.W.2d at 78 ("[W]hen a judge, in his charge to the jury, suggests that certain evidence is true or is untrue, that is a comment on the weight of the evidence.").

To fall afoul of article 36.14, an instruction need not create a mandatory presumption or implicate a non-statutory evidentiary-sufficiency rule; on the "near end of the 'improper judicial-comment' scale" are instructions that are merely "unnecessary and fail[ ] to clarify the law for the jury" or that "obliquely or indirectly convey some opinion on the weight of the evidence by singling out that evidence and inviting the jury to pay particular attention to it." *Brown*, 122 S.W.3d at 801. Moreover, even an instruction that focuses a jury's attention on a type of evidence, but "does not pluck out any specific piece of evidence," may be erroneous. *Id.*; *cf. Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019) (observing

14

that even "innocent attempt to provide clarity for the jury by including a neutral instruction can result in an impermissible comment on the weight of the evidence" by "singl[ing] out a particular piece of evidence for special attention, which the jury may then focus on as guidance from the judge" (internal quotation marks omitted)). In determining whether an instruction is a comment on the weight of the evidence, we consider the court's charge as a whole and assess the probable effect of the instruction on the jury in the context in which it was given. *O'Connell v. State*, 17 S.W.3d 746, 748 (Tex. App.—Austin 2000, no pet.); *see Russell*, 749 S.W.2d at 79.

We treat an alleged comment on the weight of the evidence as jury-charge error for purposes of harm. *See Mercado v. State*, 718 S.W.2d 291, 293 (Tex. Crim. App. 1986). The standard of review for determining whether jury-charge error was harmful depends on whether the error was preserved at trial. *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020). When, as here, the defendant does not make a timely objection during the proceedings below, we must determine whether the record establishes that the error caused him "egregious harm." *See Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020). Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Id.*; *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *see also Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019) (stating that egregious harm occurs when error "created such harm that the appellant was deprived of a fair and impartial trial"). The defendant must have suffered actual, and not merely theoretical, harm. *Gonzalez*, 610 S.W.3d at 27. In determining whether egregious harm exists, we must evaluate the entire record in light of four factors: 1) the complete jury charge; 2) the arguments of counsel; 3) the entirety of the evidence, including the contested issues and weight of the probative evidence; and 4) any other relevant factors revealed by the record as a whole. *Id.*;

15

*Hollander v. State*, 414 S.W.3d 746, 749–50 (Tex. Crim. App. 2013). In some instances, however, a single consideration may persuade a reviewing court that the risk of harm is so minimal that it precludes a finding of egregious harm. *Gonzalez*, 610 S.W.3d at 27 (citing *French v. State*, 563 S.W.3d 228, 239 (Tex. Crim. App. 2018)).

The trial court's emendation of the jury charge and remark, "'Recklessly' is not in that"—which was made in front of the jury—did not express an opinion on the weight of the evidence. The court did not single out a piece or type of evidence. *See Brown*, 122 S.W.3d at 801; *Russell*, 749 S.W.2d at 78. Neither the court's statement nor its edits assumed the truth of a controverted fact. *See Russell*, 749 S.W.2d at 78. And we fail to see how the jury necessarily viewed the statement or emendation as signifying that certain elements had or had not been proven beyond a reasonable doubt. It is more likely that viewing the court's statement and edits in context, the jury would have understood them as indicating only that the State was required to prove that Ramos intentionally or knowingly possessed a firearm. *See O'Connell*, 17 S.W.3d at 748.

Even assuming that the trial court commented on the weight of the evidence, the error did not egregiously harm Ramos. As noted above, concern with such comments centers on their potential to reduce the State's burden of proof. *Brown*, 122 S.W.3d at 798. However, by instructing the jury that it could convict Ramos only if it found beyond a reasonable doubt that he intentionally or knowingly possessed a firearm—and that proof that he did so recklessly would be insufficient—the trial court in fact heightened the State's burden. *See Hareter v. State*, 435 S.W.3d 356, 360 (Tex. App.—Amarillo 2014, no pet.) ("We hardly see how an instruction benefiting an accused can, at the same time, amount to a comment on the weight of the evidence benefiting the State."). In reasoning that the court's statement and emendation could only have

16

benefitted Ramos, we reject his argument that the jury must have understood the continued inclusion of the instructions regarding the culpable mental states of knowledge and intent as signifying that the court had found "valid evidence of intent and knowing action." As the State correctly recognizes in its brief, that inference would necessitate the conclusion that each time a trial court instructs a jury on the elements of an offense, it conveys the impression that sufficient proof of those elements has been presented by the State.

Additionally, the possibility of harm was mitigated by the remainder of the charge, the trial court's admonitions during voir dire, and the issues contested at trial. The charge instructed that evidence consists only of testimony and exhibits and that the jury could consider only evidence in determining whether the State had proven every element of the offenses beyond a reasonable doubt. The charge also instructed that "[n]othing the judge has said or done in this case should be considered by you as an opinion about the facts of this case or influence you to vote one way or the other." Absent evidence to the contrary, we presume that the jury understood and followed the court's charge. *Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011).

The latter instruction was previewed by the trial court's cautioning the jury during voir dire:

> Do not look to me for any indication on who should win, what witnesses I like, anything except that I'm calling balls and strikes. I'm relying on the Rules of Evidence, the Code of Criminal Procedure, the Texas Constitution, the United States Constitution. I'm not ever trying to send any signals.

> Sometimes I may overrule an objection eight or nine times in a row. It's not because I don't think they're doing a good job. It's just I don't believe in their objection and that's what my job is. I'm an umpire. So y'all are the ones that will make the decision based on the evidence you've heard and the charge that I give to you. Don't take any signals from me because I am not sending them.

17

Importantly, Ramos did not advance the defensive theory that he lacked the requisite culpable mental state. Both in its opening statement and closing argument, the defense stressed that the case was about "mistaken identity," "a rush to judgment," and "being lost in translation." Although much of the defense's questioning suggested the inadequacy of the law-enforcement investigation and Abernathy's identification of Ramos as the assailant, at no point did the defense explicitly or implicitly concede that Ramos had possessed a firearm but had not done so intentionally or knowingly. As defense counsel argued in closing, "Nobody knows who was in possession of this pistol . . . . We are speculating as to whether or not Mr. Ramos was in possession of that pistol. The only evidence is Mr. Abernathy."

For these reasons, even assuming without deciding that the trial court commented on the weight of the evidence, Ramos was not egregiously harmed. We overrule his second issue.

**CONCLUSION**

Having overruled both of Ramos's issues, we affirm the trial court's judgments of conviction.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed: September 19, 2025

Do Not Publish

18